## Report of David Marshall Nissman

**Retention and assignment**

I have been retained by counsel for the Estate of Ethlyn Hall and the Ethlyn Louise Hall Family Trust to provide an opinion concerning the professional duties owed by Attorney Samuel H. Hall, Jr. to Ms. Ethlyn Louise Hall in connection with the 50-year lease on Parcel 17-7, the later 75-year lease transaction, the handling of lease-related funds, the use of powers of attorney, and related fiduciary and ethical issues.

I have been an attorney for 48 years, am a member of the Virgin Islands Bar, and my opinion is based on my experience. I make this opinion to a reasonable degree of professional certainty. I have been a trial lawyer, an Adjunct Assistant law Professor, an Assistant Director of the U.S. Department of Justice Office of Legal Education, and have served in a number of capacities that imposed fiduciary duties on me. In addition, I served as the United States Attorney for the Virgin Islands, as a partner in a Virgin Islands law firm, and as a legal author. As the Publisher for the United States Department of Justice, I was the Editor-in-Chief of a Department Ethics Manual and additionally published an issue of the United States Attorney's Bulletin, the Department's national magazine, devoted to ethics.

**Documents Relied Upon**

I have reviewed the following documents:

| | |
|---|---|
| Amended Complaint (Doc. No. 32) | Defendants' Amended Answer to the Amended Complaint (Doc. No. 525) |
| Attorney Hall's Deposition in this case including the exhibits | Attorney Hall's deposition in the Florida case (three volumes) |
| The judgment in the Florida case | The final judgment on fees in the Florida case |

**Background provided by counsel for the Trustee**

Counsel for the Trustee provided me with the following background information:

**Family Tree**



Attorney Sanuel Hall provided a variety of legal services to his mother, Ethlyn Louise Hall "(Ethlyn") at no charge for many years. Relevant to the current case, Ethlyn owned Parcel 17-7, Estate Peter's Bay, St. John, USVI. In January 2003, Ethlyn leased that parcel to the Andrews St. John Trust for 50 years. Attorney Hall negotiated the terms of the lease and drafted the lease on Ethlyn's behalf.   The consideration for the lease was an obligation by John "Jack" Andrews, a trustee and creator of the Andrews St. John Trust, to build "cottages" on two nearby plots, one owned by Ethlyn's daughter (Phyllis–now deceased) and the other owned by a granddaughter (Yassin). The lease contained provisions that if the cottages were not completed by certain dates, then the Andrews St. John Trust would owe additional rent (cash) paid to the daughter and/or granddaughter. We do not dispute that Ethlyn intended to benefit her daughter or granddaughter with these gifts; nor do we challenge the validity of the 50-year lease. Phyllis and Yassin were specifically identified as intended beneficiaries of the 50-year lease. The 50-year lease provided substantial cash penalties if Andrews did not complete the construction of the cottages by the deadlines set forth in the lease.

Sometime after the 50-year lease was signed, there were discussions between Attorney Hall and Jack Andrews regarding the possibility of extending the lease.  (The testimony has not been clear as to when these discussions began.) Essentially, Andrews asserted that Phyllis had changed the footprint and various construction details of the cottages (she had no legal authority to do so and Andrews could have relied upon the written lease to reject them), making them more expensive and delaying the commencement of construction; and, that he had an understanding with Attorney Hall that they would negotiate an appropriate extension to the lease to reflect these issues. There appear to have been efforts to negotiate an extension in November 2006 that

2

continued off-and-on until they reached an agreement on new terms on December 19, 2007. We have found no documents that indicate any negotiations prior to October 30, 2006; however, both Attorney Hall and Jack Andrews assert that negotiations commenced prior to that date.

Sometime in 2005 or 2006, Jack Andrews moved from St. John to Virginia, making it difficult for him to manage the construction of the cottages. Consequently, at the same time that Jack Andrews was negotiating the extension of the lease in November 2006, he and Attorney Hall agreed that instead of managing the construction, Jack Andrews would send funds to a FirstBank checking account in Attorney Hall's name (personally) and Attorney Hall would effectively manage the construction on Jack Andrews' behalf. Between November 2006 and December 19, 2007 when the lease "extension" was agreed upon, Jack Andrews sent $170,000 to Attorney Hall's personal FirstBank checking account to be used for the construction of the two houses.

While the lease extension negotiations were in progress and while Attorney Hall was managing the construction of the cottages for Jack Andrews, he was also providing legal services to his mother. On Friday, August 3, 2007, Attorney Hall went to St. John with three documents he had prepared for Ethlyn to sign. The first was a letter purportedly authorizing Attorney Hall "to halt or postpone the construction of the cottage of Phyllis Hall . . . in favor of the construction of his home on Parcel No. 17-5, and to reprogram money from the Tenant under the Ground Lease for this purpose."  The letter further stated, "This is being done to permit him to complete his home in order to expedite his assistance of me in my future care on St. John." The document bears a signature "Ethlyn Lindquist Hall".  Attorney Hall has testified that Ethlyn told him what to write in this letter, that he confirmed it with her over the telephone, and then brought it to St. John where she signed it. There are no witnesses to the document other than Attorney Hall (who did not sign as a witness). In a deposition in the case in Florida, Attorney Hall testified that he had Ethlyn sign this document to "memorialize the gift and *protect me* from those that assert that she did not give me a gift." Attorney Hall asserts that Ethlyn wanted to stop funding the construction of Phyllis' cottage because they had a falling out; however, before this August 3, 2007 letter, Attorney Hall had made it clear in emails that *he* was angry at Phyllis (his sister) because he perceived that she was not paying what he believed to be appropriate attention to his mother's needs and as a result, he was not willing to continue to manage the construction of her cottage.

The "reprogramming letter" makes no mention of the fact that Phyllis is a third-party beneficiary under the 50-year lease. Attorney Hall apparently believed that his mother could revoke the gift to Phyllis even though the 50-year lease specified that construction of her cottage was part of the rent and specifically identified Phyllis as an intended third-party beneficiary of the lease.

Attorney Hall also testified that he gave his mother two other documents on August 3, 2007: A power of attorney from his mother to himself and an assignment of the 50-year lease from his mother to himself.  These documents were signed the following day (Saturday, August 4, 2007).

The power of attorney was witnessed by two individuals who performed work for Attorney Hall around his house and law office. It was not notarized. The power of attorney purported to

3

irrevocably appoint Attorney Hall as Ethlyn's attorney-in-fact and agent relating to various actions regarding the lease with the Andrews St. John Trust. Attorney Hall has testified that this was needed so that he could negotiate the extension of the lease with Jack Andrews. Five years earlier, however, Attorney Hall did not require a power of attorney to negotiate the original lease with Jack Andrews.

The assignment of the 50-year lease to Attorney Hall was witnessed by the same witnesses as the POA. A signature purporting to be Ethlyn's appears on the document, along with Attorney Hall's signature. He testified in his Florida deposition that he never used this document and only had it as a backup in case Ethlyn died. He claimed it would allow him to continue to finish the construction if Ethlyn died (which, of course, would terminate the POA so that could not be the case). Since Attorney Hall was managing the construction and doing so on behalf of Jack Andrews before the assignment, this explanation does not appear to make sense. (The assignment would, however, seemingly allow the "gift" to Attorney Hall to continue after Ethlyn's death.) He also testified that his mother wanted him to have the benefit of the ground lease (via the assignment) to assist him in finishing his house. Attorney Hall further testified that Ethlyn offered him the gift because she wanted him "to be responsible for completing Yassin's house." In case it is relevant, Attorney Hall testified that he didn't have sufficient funds of his own to complete construction of his house at the time his mother allegedly gave him the "gift."

On December 19, 2007, Attorney Hall and Jack Andrews agreed to the essential terms of the "extension" of the lease. By this time, a new party had agreed to step into the shoes of the Andrews St. John Trust. The new party was the Talton Family Trust. Although the negotiations between Attorney Hall and Jack Andrews were about an "extension," the agreement ultimately reduced to writing was a new lease of 75 years, commencing one year later, on December 2, 2008, with the Talton Family Trust.

Since the 50-year lease had begun in January 2003, this was effectively an extension of the 50-year lease to 81 years. (75 years on the new lease plus the almost six years that had elapsed from the time of the first lease.) This new lease identifies the landlord as "Ethlyn L. Hall by and through her attorney in fact, Attorney Samuel H. Hall, Jr." It provides for a lump sum rent payment of $800,000, paid in advance and non-refundable, payable to "Attorney Samuel H. Hall, Jr. as Landlord's agent and attorney in fact." [1] Attorney Hall sent a draft of this lease to the Talton Family Trust but did not get a response as to whether there were any concerns about the lease language. Interestingly, during the early dealings with the Talton Family Trust on the 75-year lease, David Talton, one of the trustees, wanted to ask Attorney Hall questions about dispute resolution under the lease. Attorney Hall responded

> I understand that you want to ask me questions about dispute resolution in
> the event of a dispute under the lease between the Landlord and the

---

[1] In the original 50-year lease, Priscilla Hall and Yassin are identified as intended third party beneficiaries in this lease (Section 23.19).

> Tenant. The lease, as well as an amendment extending its term to 75 years, was negotiated between me and Jack and *I served as my mother's counsel as well as an interested party.*

Doc. L-000148 (Exhibit 84 to Attorney Hall's deposition in the Virgin Islands) (emphasis added).

Further, the attorney for Jack Andrews wanted the third-party beneficiaries under the 50-year lease to sign a release. Attorney Hall responded to this request:

> I have no problem with getting my mother to sign the release. But I am not willing to go to the third-party beneficiaries to seek their permission to cancel a lease which my mother alone controls. First, in all likelihood I may not get it from both of them. I am no longer building a house for one of them due to her failure to look after her mother. Second, they have no legal right to prevent the cancellation of the current lease. Third, by asking them to sign a release, it implies that they do have the power to prevent its cancellation, which they do not.

Plaintiff Hall 006156.

Attorney Hall ultimately signed the 75-year lease as attorney-in-fact for his mother on December 2, 2008. He claimed to do so because the day before, Ms. Hall had fallen and hurt her ankle. In an email informing the Talton Family Trust that he signed it, his explanation implies that he was concerned that because of her age, she might pass away without signing the lease. He also signed a cancellation of the 50-year lease using the power of attorney.

In August 2008, Attorney Hall obtained a second power of attorney from Ethlyn, this one witnessed by a Hall & Griffith employee and notarized and witnessed by Attorney Hall's law partner, Marie Thomas-Griffith. He testified that he obtained this POA because he "didn't want to have anybody question the legitimacy of my authority to act."

The total $800,000 lump sum rent payment was actually paid into Attorney Hall's personal FirstBank checking account in installments between January 14, 2008 and February 17, 2010. (The actual cash payments totaled $780,826.00 and Attorney Hall gave a credit of $19,174 for in-kind work done by Jack Andrews near the time that they agreed to terms on the "extension" on December 19, 2007.) All of these funds were ostensibly spent on the construction of Attorney Hall's and Yassin's (the granddaughter's) houses, with Attorney Hall managing the construction. In fact, these funds proved to be insufficient to complete either house. Yassin did not have the credit or funds to complete the construction and Attorney Hall took out a loan of $130,000 in May 2011 to allow Yassin to complete the construction on her house; although Attorney Hall is on the promissory note, a mortgage securing repayment of the promissory note was placed on property owned by Yassin. Attorney Hall is making the loan payments on this loan and Yassin reimburses him from the rental income she receives from renting out her house as a weekly vacation rental. (This despite the fact that he testified in the Florida case that the one reason for

5

Ethlyn's "gift" to him was as an inducement for him to complete the construction of Yassin's house.)

On February 19, 2010, Attorney Hall held a "closing" on the 75-year lease. He signed an early termination of the 50-year lease, created a closing statement, and forwarded these documents to the Talton Family Trust along with the 75-year lease bearing his original signature. On March 9, 2011, Hall & Griffith filed a 1099-S with the VI-IRB indicating that Ethlyn had received proceeds of $1,070,000 for the leasehold interest in Parcel 17-7. Based upon the closing statement, these proceeds were received between 2003 and 2010.

The early termination of the 50-year lease ended any obligation that the St. John Andrews Trust had to pay the rent it owed for failing to complete the construction of the two cottages within the deadline specified in the 50-year lease. Attorney Hall estimated that by the end of 2007, this rent totaled approximately $250,000. He also testified that he thought collecting this rent would be problematic.

Ethlyn's daughter Elsa returned to the Territory in early 2010 and began assisting her mother. In August 2010, Ethlyn decided to move into an apartment in Cruz Bay out of concern that she be closer to medical care and less isolated. (Her home in Peter's Bay was inside the National Park boundaries near Cinnamon Bay.) Elsa assisted her mother and stayed with her in Cruz Bay. While in Cruz Bay, Elsa began organizing her mother's files and discovered copies of documents such as the 2007 power of attorney and the August 3, 2007 letter "reprogramming funds" from the construction of Phyllis' cottage to the construction of Attorney Hall's house. Some of the documents were signed; others were not. Elsa was concerned as to what obligations her mother had undertaken or rights she had assigned to Attorney Hall. On August 27, 2010, Ethlyn wrote Attorney Hall (with Elsa's assistance) and asked him to give her an accounting of all of her financial obligations. On September 27, 2010, she asked Attorney Hall to give her a status of the lease that she signed with the Andrews St. John Trust on January 24, 2003. Attorney Hall refused to respond. In his deposition, he explained that he believed that Elsa was writing the letters and thus he was not going to respond. He also refused to give a copy of his mother's file to her when she requested it, for the same reason.

In October 2010, Elsa contacted Attorney John Stryker to seek his assistance in preparing a trust for her mother. Attorney Stryker created that trust and additional documents transferring all of Ethlyn's assets into the trust. He met with Ethlyn on November 10, 2010 and was satisfied that she understood the documents and intended to distribute the property in the manner that is specified in the trust. Ethlyn signed the trust documents. (Ethlyn initially attempted to discuss a trust with Attorney Ronald Belfon; however, he was not moving quickly enough for Ethlyn and she decided to instead use Stryker.)

6

On February 1, 2011, Attorney Hall sent his mother a letter indicating that in 2010 she had a capital gain of $1,070,000 upon which tax was owed; however, he indicated that he, Phyllis and Yassin were responsible for their respective shares of this gain since they were the recipients of the gifts from Ethlyn that generated those gains. Although Attorney Hall calculated Phyllis' portion of the tax, he provided no information that allowed Ethlyn to calculate the amount due from either Attorney Hall or Yassin. Virgin Islands CPA has rendered an expert report on behalf of the Trust that opines that the amounts paid as rent for the construction of the cottages/houses (whether paid in-kind or cash) was reportable as ordinary income during each year that services were rendered or cash was received. He has also opined that it was error to issue a 1099-S as the income was not a capital gain. When Ethlyn received the above letter, this was the first time she knew that she had any tax liability for any of the transactions for either lease. In fact, this is likely the first time she knew that there was a second lease or that Jack Andrews was no longer her tenant although a few months earlier, she may have heard rumors that Andrews was no longer the tenant (without any explanation about the new lease).

On April 22, 2011, I sent Attorney Hall an email with a copy of a draft complaint that Ethlyn had authorized me to file against him, with a suggestion that we try to resolve the case before I filed it. On April 29, 2011, Attorney Hall filed an emergency petition seeking the appointment of a guardian for Ethlyn.  Ethlyn filed her suit against Attorney Hall on May 9, 2011. Attorney Hall was formally served on May 24, 2011.

On May 27, 2011, $125,066.07 was deposited in Attorney Hall's personal FirstBank account. This represented the loan from Banco Popular that he took out to assist Yassin in completing the construction of her house (probably with a slight reduction for closing costs from the $130,000 principal balance of the loan). On June 3, 2011, Attorney Hall wrote a check from this account, payable to his law firm trust account, in the sum of $60,000. The memo on this check states that it was for "Ethlyn Hall lease tax." Attorney Hall has testified that this money was set aside to pay a part of *Yassin*'s tax obligation owed to Ethlyn. (He has also testified that he agreed to pay anything Yassin owed for the taxes above the $60,000.) He subsequently withdrew $25,000 of this $60,000 fund from the trust account with his and Yassin's approval (none from Ethyln!) to allow Yassin to use it to complete the construction of her house.  Attorney Hall has testified that even to the date of his deposition, he considered himself to be representing his mother (who was suing him by then).

**Assumptions relied upon**

Counsel for the Trustee informed me that he reasonable expects to prove the following at trial and that I may therefore rely upon the following assumptions:

1. As of January 24, 2003, Ethlyn owned Parcel 17-7 in fee simple and free-and-clear of any mortgages or liens. She had owned the property for many years.

2. As of January 24, 2003, Parcel 17-7 was essentially unimproved (there may have been prior road grading and site work, but there were no permanent structures).

7

3. Attorney Hall represented his mother, Ethlyn in a variety of legal matters for many years. As of 2007, he had represented her for at least 25 years.

4. At least as early as August 2002, Attorney Hall was representing his mother in negotiations relating to a potential lease of Parcel 17-7.

5. On January 24, 2003, Ethlyn, as landlord, signed a 50-year lease on Parcel 17-7 ("50-year lease") with the Andrews St. John Trust.

6. Jack Andrews was an agent of the Andrews St. John Trust.

7. The 50-year lease was drafted by Attorney Hall.

8. The 50-year lease called for the construction of two cottages (on Parcels 17-4 and 17-6) as the primary consideration for the lease. (Additional consideration included the granting of a 20-foot-wide right-of-way to benefit parcel 17-7 and reimbursement for all property taxes paid on parcel 17-7.)

9. As of January 24, 2003, Ethlyn's granddaughter, Yassin Hall-Young ("Yassin"), owned Parcel 17-6, Estate Peter Bay.

10. As of January 24, 2003, Ethlyn's daughter, Phyllis Hall Brin ("Phyllis") owned Parcel 17-4, Estate Peter Bay.

11. Beginning sometime in 2003 and through the end of 2006, the tenant (Jack Andrews) under the 50-year lease paid for services associated with improvements to Parcels 17-4 and 17-6. The costs of those services totaled $472,357.00. Those costs do not include any construction management (if any) provided by Jack Andrews.

12. In late 2006, the tenant (Jack Andrews) began to transfer funds to Attorney Hall that were used to continue construction on the two cottages. There was no written amendment to the lease. Attorney Hall has testified that he was initially acting as a "disbursing agent" for these funds on behalf of Andrews and that his role evolved into that of a construction manager. All told, between November 20 and Dec. 29, 2006, Andrews transferred $75,000 to a personal checking account in Attorney Hall's name that was used to pay for construction on the two cottages (we do not know whether it was used to pay for anything else or not).

13. On August 3, 2007, Ethlyn purportedly signed a letter authorizing Attorney Hall to halt construction on Phyllis's cottage and reprogram that money to the construction (already in progress) of a house Attorney Hall was building on a nearby parcel of land that he owned.

14. On August 4, 2007, Ethlyn purportedly signed a power of attorney authorizing Attorney Hall to act as her attorney in fact in renegotiating the 50-year lease.

15. Sometime before the end of 2007, all work ceased on Phyllis's cottage.

16. Attorney Hall began to use funds transferred to Attorney Hall's personal checking account by Jack Andrews under either the 50-year lease or 75-year lease (or both) for purposes of completing construction on Attorney Hall's house in Peter Bay at some point in 2007 and perhaps earlier.

8

17. On December 19, 2007, Attorney Hall agreed with Jack Andrews to an amendment to the lease that would "convert it" to a 75-year lease for a lump sum payment of $800,000 (payable in advance). At the same time, Andrews was negotiating with an acquaintance (David Talton) to take over the lease, provided he could get an acceptable extension. (Attorney Hall was aware of Andrews' plans.)

18. According to the offer made by Andrews' attorney in an email to Attorney Hall (and which was accepted by Attorney Hall), Andrews would pay $800,000 "and you finish the project, with no further involvement of him."

19. In 2007, Andrews transferred a total of $195,000 to Attorney Hall's personal checking account and provided in-kind services of $15,499. Attorney Hall only credited this in-kind payment against the $800,000 lump sum payment due under the new lease arrangement. None of the cash transferred in 2007 ($195k) was credited towards the $800,000 lump sum and Attorney Hall considered those cash payments to be part of Andrews' obligations under the 50-year lease.

20. Attorney Hall prepared a new 75-year lease in 2008, along with a document terminating the 50-year lease, and forwarded both to Talton. The lease prepared by Attorney Hall specified that the $800,000 would be paid to him as agent for Ethlyn. Talton never responded as to whether or not the lease terms were acceptable.

21. In 2008, despite not having a signed the 75-year lease, Andrews and Talton made payments to Attorney Hall that were intended to be (and were) credited against the $800,000 lump sum payment. The payments in 2008 were made via wire transfer to Attorney Hall's personal checking account and totaled $481,675.00.

22. On April 14, 2008, Jack Andrews' concrete pumping truck delivered concrete for use in Attorney Hall's driveway. Attorney Hall agreed that the price of this concrete, $3,675.00, was appropriately credited towards partial payment of the $800,000 lump sum payment due under the 75-year lease.

23. On August 13, 2008, Ethlyn purportedly signed a new power of attorney authorizing Attorney Hall to act as her attorney in fact in negotiating or renegotiating any lease on Parcel 17-7.

24. On December 2, 2008, Attorney Hall signed the 75-year lease as attorney in fact for Ethlyn but still did not have a counter signature from Talton.

25. Throughout 2009, Andrews and Talton wire transferred a total of $270,000 to Attorney Hall's personal checking account for credit against the $800,000 lump sum due under the new lease. Typically, these payments were made in $30,000 increments.

26. On February 17, 2010, Jack Andrews wire transferred $32,826 to Attorney Hall's personal checking account. This represented the final payment towards the $800,000 lump sum.

27. On February 19, 2010, Attorney Hall "held" a closing in which he did the following:

28. Mailed the signed lease to Talton. (Still unsigned by Talton.) The effective date of the lease is presumably the date Attorney Hall signed it (Dec. 2, 2008)

9

29. Delivered an "early termination" of the 50-year lease, signed by Jack Andrews on Oct. 28, 2009 and by Attorney Hall on February 19, 2010.

30. Created a closing statement that indicated that Andrews paid $270,000 between 11/6/2003 and 11/23/2007 towards the "purchase price" and Andrews and Talton paid $800,000 between January 14, 2008 and February 23, 2010 towards the "purchase price."

31. On March 9, 2010, Attorney Hall or his law firm filed a 1099-S with the VI-IRB indicating that Ethlyn was the transferor of a leasehold interest in Parcel 17-7 with gross proceeds of $1,070,000. The box in part 4 of the 1099-S that is to be checked if the transferor received property or services as part of the consideration was not checked.

32. On November 10, 2010, Ethlyn formed a living trust for estate planning purposes and transferred all of her assets, including Parcel 17-7, into the Ethlyn Louise Hall Family Trust.

33. On February 1, 2011, Attorney Hall sent Ethlyn a letter informing her that "The lease on Parcel 17-7 generated gains which must be reported by you in 2010 as a capital gain of $1,070,000." He further stated, "As you know, from this money, Phyllis received a one story structure on her parcel; Yassin a house and I received assistance to complete my house. Each person who benefitted from this money is required to pay the tax on the portion he or she received the benefit of."

34. There is nothing in writing to indicate that either Phyllis or Yassin ever agreed to be responsible for Ethlyn's tax obligations relating to the rent from the lease.

35. There is nothing in writing to establish that Ethlyn was aware that Attorney Hall had negotiated the 75-year lease or that she had agreed to an $800,000 lump sum payment. (Attorney Hall has testified that he told Ethlyn about the lease and gave her a copy. Elsa did not find a copy of the 75-year lease in Ethlyn's records when Ethlyn moved from her Peter Bay home in August 2010.

36. Even if one assumes that Ethlyn intended to allow Attorney Hall to use funds from the 50-year lease to help construct his home (a sharply disputed fact), there is nothing in writing to indicate that she gave Attorney Hall carte blanche to use whatever income he could generate from a renegotiated lease to help build his home or to build Yassin's cottage beyond the scope of either the scope originally contemplated by the 50-year lease or the scope of that home as modified by the changes that Phyllis wanted made to the cottages.

37. Until approximately April 23, 2011, and at all material times before that date, Ethlyn was a bona fide resident of the U.S. Virgin Islands. She was born on St. John on June 6, 1916.

38. On April 23, 2011, Ethlyn moved permanently to Florida and established her domicile there and maintained Florida as her residence and domicile until her death.

39. Ethlyn passed away in Florida on May 5, 2012.

**Testimony in the past four years**

I have not testified as an expert in either a deposition or trial (or other proceeding) in the past four years.

**Compensation**

My normal hourly rate is $950.00 per hour but I have agreed to discount my rate to $750.00 plus my costs when, as in this case, the client provides a replenishable retainer. I have spent approximately 30 hours on this matter. My hourly rate applies to my deposition, if taken. I require that my deposition fee be paid in advance, with deposing counsel informing me as to how much time they wish for me to set aside for the deposition to be taken in Puerto Rico. Because that time is set aside, the fee is non-refundable. I will terminate the deposition when the allotted time has expired unless (a) I do not have another commitment and (b) deposing counsel confirms on the record that they will promptly remit the additional fee upon the conclusion of the deposition.  I have agreed that I will not charge for my testimony at the trial of this matter in August 2026.

**Governing duties**

Before addressing the lease transactions individually, it is important to identify the core duties that governed Attorney Hall's conduct. While there are many areas of ethical concern presented by Attorney Hall's conduct, one of the more troubling issues is self-dealing. Self-dealing is a breach of the fiduciary duty of loyalty that occurs when a person who is bound by fiduciary duties uses his or her position to undertake a transaction in which the fiduciary obtains a personal benefit at the expense of the client that the fiduciary is allegedly serving. Classic examples include a fiduciary diverting assets or opportunities to himself, purchasing or selling property on non-arm's-length terms, or using control of funds to advance his own interests rather than those of the principal or client.  It is important to note that the operative ethics rules only establish a minimal standard.  It provides us with an understanding of where we cross prohibited lines from an ethical perspective but lawyers can commit torts and contract violations even where an ethical line is not crossed.  Lawyers have duties that go beyond the minimal standards of the ethics rules and sometimes it is the attorney that creates the additional duty. For example, Model Rule 1.8 sets up guardrails when lawyers receive gifts from clients and 1.8 does not prohibit all gifts to lawyers from family members but 1.8(c) does not remove the guard rails in place.  Even where Rule 1.8(c) permits a lawyer to receive a gift from a related client, the gift remains subject to attack under undue-influence principles, and if the lawyer participates in drafting or structuring the transaction, the broader conflict rules require additional safeguards.

Based on the materials I reviewed, Attorney Hall was acting in overlapping roles as Ethlyn Hall's attorney, as her son in a position of confidence and influence, as a purported attorney-in-fact under powers of attorney, as the drafter and negotiator of lease documents, as the handler of funds generated by those lease arrangements, and as a direct beneficiary of the transactions he

11

structured. Even if an attorney operates in many different roles, he is not relieved of his duties and obligations as an attorney. Attorney Hall was acting in the capacity of his mother's attorney, and the strict duties discussed in this report did not stop applying to him merely because he was her son. As discussed in this report, many of those required duties were breached by his conduct.

Those overlapping roles imposed strict duties of loyalty, candor, fair dealing, full disclosure, segregation and accounting of funds, avoidance of self-dealing, avoidance of conflicts of interest, and the obligation to ensure that Ethlyn Hall had the benefit of independent legal advice before any transaction was undertaken that conferred a material benefit on Attorney Hall or placed his interests in conflict with hers.

When Attorney Hall undertook to draft documents for his mother that benefited him personally, to receive lease-related money into his own personal account, to use powers of attorney in transactions from which he benefitted, and to treat lease proceeds as a source of funding the construction of his house, he violated his fiduciary duties imposed upon him by his license to practice law.

In the absence of full disclosure, informed written consent, independent legal advice, transparent recordkeeping, and clear authority for self-dealing, his conduct falls below the standard of care applicable to an attorney and separately below the standard of care applicable to an attorney-in-fact.

**75-year lease**

It is my opinion that Attorney Hall committed legal malpractice and breached fiduciary duties in the manner in which he structured, modified, and implemented the 75-year lease arrangements.

First, once Attorney Hall was representing Ethlyn Hall as her attorney, he could not properly prepare documents for her signature that redirected value from an existing arrangement to his own personal benefit unless the transaction was demonstrably fair, fully disclosed in writing, and undertaken only after she had been advised to obtain independent legal advice and had a meaningful opportunity to do so.

The August 3, 2007 modification is a classic self-benefiting instrument: it redirected value associated with Phyllis's cottage to the completion of Attorney Hall's own residence, was prepared by Attorney Hall himself, and was later described by him as something he wanted to have signed to protect himself.

The Virgin Islands ethical rules on this point, during the relevant period, were the Model Rules-based conflict regime applicable in the Territory, including Model Rule 1.7 and Model Rule 1.8(a). Model Rule 1.7 governed concurrent conflicts of interest, and Model Rule 1.8(a) governed business transactions with a client, and other situations in which a lawyer acquires a pecuniary interest potentially adverse to a client (as well as to third-party beneficiaries of a contract that his client (his mother) directed him to create in the 50-year lease). Under Model

12

Rule 1.8(a), a lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless the transaction is fair and reasonable, fully disclosed in writing in a manner the client can reasonably understand, the client is advised in writing of the desirability of seeking independent legal counsel and given a reasonable opportunity to do so, and the client gives informed consent in a signed writing to the essential terms and the lawyer's role in the transaction.

It is my understanding that Attorney Hall is relying on Model Rule 1.8(c) as the legal and ethical basis for his conduct concerning the 75-year lease and the gift his self-authored documents granted to him. Assuming arguendo, that Ethlyn Hall authorized the gift, Rule 1.8(c) does not relieve Attorney Hall from the separate obligations of Model Rule 1.7, the conflict-of-interest rule. Rule 1.7(a)(2) prohibits a lawyer from representing a client if there is a significant risk that the representation will be affected by the personal interest of the lawyer. When a lawyer drafts documents that gives himself a benefit while extinguishing a benefit previously given to a sibling, the lawyer's financial interest creates a classic Model Rule 1.7 conflict "if there is a significant risk that the representation of one or more clients will be materially limited by... a personal interest of the lawyer." Model Rule 1.7(a)(2). When a lawyer drafts estate documents from which he personally benefits (such as taking away a gift from his mother to a niece and giving it to himself) this personal financial interest creates a textbook Rule 1.7 conflict. See In *In re Disciplinary Action Against Overboe*, 844 N.W.2d 851 (N.W. 2014).

A lawyer acting in those circumstances should not have drafted that document for the client. Attorney Hall should have declined to participate unless Ms. Ethlyn Hall had separate counsel who fully advised her concerning the legal consequences, the conflict of interest, the rights of the existing beneficiaries, and the legal risk of a challenged gift transaction. While Rule 1.8(c) permits lawyers to receive gifts from family members, it does not eliminate ethical principles surrounding the gift. The North Carolina Bar Association's interpretation of 1.8(c) at Comment 6 states:

> A lawyer may accept a gift from a client, if the transaction meets general standards of fairness. For example, a simple gift such as a present given at a holiday or as a token of appreciation is permitted. *If a client offers the lawyer a more substantial gift, paragraph (c) does not prohibit the lawyer from accepting it, although such a gift may be voidable by the client under the doctrine of undue influence, which treats client gifts as presumptively fraudulent.* In any event, due to concerns about overreaching and imposition on clients, a lawyer may not suggest that a substantial gift be made to the lawyer or for the lawyer's benefit, except where the lawyer is related to the client as set forth in paragraph (c).

Note that the last sentence of this comment only permits the lawyer to *solicit* the gift through suggestion. The comment does, however, say that the gift is voidable under the doctrine of undue

13

influence and it creates a rebuttable presumption that the gift is fraudulent. Moreover, if the lawyer participates in drafting or structuring the transaction in which the gift is implicated, as previously stated in this report, the broader conflict rules need be analyzed.

This conclusion applies to the August 4, 2007 power of attorney and to the assignment. If Attorney Hall prepared or procured those documents while already seeking to preserve or enlarge a personal benefit arising out of the lease structure, then he was placing himself on both sides of the transaction and entrenching the very conflict he was obligated to avoid. But a power of attorney does not give the attorney-in-fact unlimited power to engage in self-dealing. The POA was an instrument used in Attorney Hall's case to accomplish this purpose.

An attorney cannot solve a conflict by drafting more documents that increase his control over the conflicted transaction. The proper course was to halt, disclose, withdraw from the conflicted role, and advise Ethlyn that she should be represented by disinterested counsel before any such documents were executed.

Even when the lawyer and client are related, a gift is not automatically insulated from scrutiny; the Restatement treats such gifts as permissible only if they are consistent with the family context and not the product of overreaching or undue influence. See Restatement 3rd, Rule Governing Lawyers, Section 127(1).

A case from South Dakota is instructive. Attorney Jon Mattson, was sanctioned for his conduct in receiving gifts from his uncle (referred to in the opinion as Uncle Pete) who Mattson was working for as an attorney. The uncle was 90 years old (similar to Ethlyn's age) and Attorney Mattson relied on Rule 1.8(c) to justify directing gifts to himself as he was related to Uncle Pete. The Supreme Court of South Dakota did not agree:

> In this case Mattson took advantage of a man he claimed to have a father/son relationship with by engaging in an egregious course of conduct to enrich himself and his wife. He failed to get verification that he was carrying out Uncle Pete's wishes and failed to have an independent lawyer advise Uncle Pete about the financial transactions. In the course of these transactions Mattson breached his fiduciary duties, destroyed records, used the power of attorney after Uncle Pete's death, signed Uncle Pete's name without using his own name with the power of attorney designation, and used cashier's checks so transactions would not go through Uncle Pete's bank records. Mattson elevated his personal monetary gain over Uncle Pete's best interests and over the Rules of Professional Conduct.

*In the Matter of the Discipline of Jon W. Mattson, as an Attorney at Law*, 651 N.W.2d 278, 288-289 (S.D. 2003).

The Court also said that as "power of attorney for Uncle Pete, Mattson had the fiduciary duty to act in the highest good faith and refrain from obtaining any advantage by the slightest

misrepresentation or adverse pressure. By not doing so, the Referee concluded that …. Mattson violated the spirit of the preamble of the Rules of Professional Conduct, as well as Rules 1.7, 1.8 and 8.4." 651 N.W.2d at 285.

The later 75-year lease compounds rather than cures the problem. Based on my review of documents including the deposition of Attorney Hall, Attorney Hall negotiated the extension, prepared the new lease, signed it by use of a power of attorney, arranged for the $800,000.00 payment to be made to himself as his mother's agent and attorney-in-fact, made himself and Yassin intended third-party beneficiaries, and cancelled the 50-year lease despite the existence of potential prior third-party-beneficiary rights and potential penalty-rent obligations.

That course of conduct reflects multiple simultaneous conflicts of interest: lawyer and beneficiary, agent and beneficiary, negotiator and payee, recordkeeper and recipient, and legal advisor and interested party. This conduct is below the professional standard of care required both of attorneys and fiduciaries.

Attorney Hall's statement that he acted as both his mother's counsel and an interested party is especially significant. That statement is an admission of a disqualifying conflict, not an explanation that cures one.

The 75-year lease also raises substantial concerns of substantive fairness. It dramatically extended the term of the original transaction, replaced the prior structure with a large nonrefundable lump sum, extinguished the old lease, and directed the economic benefit into a structure controlled by Attorney Hall, with the money then used for projects from which he and Yassin benefitted and which formally ended any legal obligation on the part of the tenant to build Priscilla's house. While Attorney Hall claims in his deposition that the decision to quit building Priscilla's home was Ethlyn's decision, in an angry letter that appears to be directed to Priscilla sent to the Hillcrest Guest House on June 8, 2009, Attorney Hall claimed that: "You know good and well that I stopped building on 17-4 Peter Bay because you were not taking care of or looking after Ma." See Exhibit 95.

In this letter, Attorney Hall claims he made the decision to stop building her house. One of the main differences in the 50- and 75-year leases is that the construction of Attorney Hall's house is substituted for the construction of Priscilla's house. Moreover, in Exhibit 96, a letter Attorney Hall sent to Priscilla's daughter, he again claims it was his decision to stop construction on Priscilla's house: "[I] made clear to Ma a long time ago I would not finish it because of Phyllis' conduct." If an attorney who had control of the property decided to take advantage of Phyllis' alleged conduct to benefit himself without complying with the applicable conflict rules, the transaction was voidable and the monies Hall received should be returned. Even if one assumes Ethlyn wanted to change beneficiaries, that does not authorize her lawyer to structure the transaction in a way that enriches himself, uses his own agency authority to capture control of the money flow, and eliminates the protective measures that fiduciary law requires, particularly when he failed to advise his client of Priscilla's rights under the 2003 contract.

15

At the time Attorney Hall claims to have made the decision to cancel his mother's gift to Priscilla and essentially substitute himself in her position, Ms. Ethlyn Hall was approximately 92 years old and declining in health.

In Attorney Hall's deposition, he testified that on December 2, 2008 he signed the 75-year lease, held it in trust, and said it was not delivered until the final payment was received. He also testified that, during that period, the parties continued to operate under the 50-year lease. See Attorney Hall deposition, pages 41-42.

The 2003 Ground Lease required the tenant to build the two cottages for Priscilla and Yassim, and if the cottages were not completed within four years the tenant had to pay a monthly rent to Phyllis Hall Brin until completion. The contract provides that Ethlyn Hall, Phyllis Hall Brin, and Yassin Hall Young retained the right to seek injunctive relief and to sue for specific performance. The 50-year lease created enforceable rights in the named family members.

If Phyllis had a right to enforce the lease provisions requiring the tenant to build her house, the lease does not appear to reserve to Ethlyn any unilateral residual right to amend or cancel that obligation at will, apart from the lease's modification and termination mechanisms, which do not contain any language suggesting that Ethlyn retained a right to unilaterally modify the 2003 lease to cancel the building requirements for Phyllis' house.

Given the fact that the lease contract may have provided Phyllis with enforceable rights, Attorney Hall had a duty to advise his client, Ethlyn, that if she proceeded to cancel Phyllis' house project, she was subjecting herself to potential legal action by Phyllis. So, if he convinced Ethlyn to cancel Phyllis' house project without disclosing the beneficiary-rights issue and without managing his own conflict, that would raise serious ethical concerns: lack of loyalty, inadequate disclosure, and possible assistance in conduct that breached the contract.

There is an email from Attorney Hall to Attorney Tim Sullivan in which Attorney Hall strongly objects to attempting to get the consent of two of the third-party beneficiaries, Phyllis and Yassin, dated April 23, 2008, to enter into a new lease arrangement that would cancel the lease that vested them with rights as third-party beneficiaries:

"I have no problem with getting my mother to sign the release. But I am not willing to go to the third-party beneficiaries to seek their permission to cancel a lease which my mother alone controls. First, in all likelihood I may not get it from both of them. I am no longer building a house for one of them due to her failure to look after her mother. Second, they have no legal right to prevent the cancellation of the current lease. Third, by asking them to sign a release, it implies that they do have the power to prevent its cancellation, which they do not. Other than that, the release is fine."

Attorney Hall should have told Ethlyn that:

1. Phyllis may have an enforceable right to insist on performance of the house-construction obligation.

2. Ethlyn could not simply cancel that obligation if the lease did not reserve that power in Ethlyn.

3. Any modification might require Phyllis' consent, or at least compliance with whatever amendment and termination mechanisms the lease required.

The ethical duties implicated by Attorney Hall's conduct in directing the cancellation of Phyllis' house-construction project are:

1. Duty of loyalty: He had to put Ethlyn's interests ahead of his own and avoid using the advice to advance his personal interests.

2. Duty of candor and full disclosure: He had to explain the legal effect of canceling the provision, including that Phyllis might have enforceable rights as an intended beneficiary and could sue for specific performance or damages.

3. Duty to identify conflicts: If Attorney Hall stood to benefit from stopping Phyllis's construction, he had to recognize that his advice was materially limited by his own interests and fully disclose that conflict to Ethlyn.  Note that Model Rule 1.8(c) does not prohibit gifts from family members to lawyers but it does not eliminate the lawyer's ethical duties- this particular duty existed irrespective of the gift from Ethlyn to attorney Hall.

4. Duty to recommend independent counsel: Because the advice involved a transaction that could benefit him personally and harm a beneficiary he had helped identify in the lease, he should have told Ethlyn to get independent advice before acting and that advice should have been memorialized in writing.

5. Duty not to facilitate wrongful conduct: If he knew the cancellation would impair vested beneficiary rights or breach the lease, he should not have helped Ethlyn violate a third-party beneficiary's rights.

Once Attorney Hall put himself in this position concerning the new distribution structure in the 75-year lease, he also had a duty to obtain expert advice on any tax issues that resulted from the restructuring of the lease prior to executing the lease modification.

The advice Attorney Hall gave concerning the tax treatment of the lump sum payments from the 75-year lease is incorrect and there are negative consequences that flow from this advice. During the relevant time period the Internal Revenue Code provided that lump sum rental payments are to be treated as ordinary income taxable in the year received. Lump sum rent payments are not treated as capital gains.

Attorney Hall wrote a letter to his siblings asking them to assist with his mother's health issues in 2011. That letter is referred to in the materials I reviewed as Exhibit 61. Attorney Hall declares in the letter, referring to Ethlyn as "Ma," that "[i]f there is one thing Ma has taught us it is not to sell our land." Attorney Hall himself makes this point in his deposition at page 83 when he says: "My mother under no circumstances would have sold any property and certainly would not have sold or even considered selling her house. She wanted to be buried on Parcel 16." While Ethlyn Hall's family principle that she would never sell land is not itself a tax rule, it is relevant background evidence because it suggests that Attorney Hall understood the transaction as a lease and development arrangement, not a conventional sale of land.

That context weakens any after-the-fact attempt to characterize the payment stream as a capital gain arising from a sale. The tax analysis must still turn on the legal substance of the documents and the actual transfer of property rights, but Ethlyn's expressed philosophy is useful corroboration that Hall's capital-gain label may not match the parties' own understanding of the deal.

A lawyer structuring a long-term lease transaction that substitutes a large lump-sum arrangement for a preexisting performance-based structure must consider foreseeable tax consequences and advise the client to obtain specialized tax advice if the lawyer is not competent to undertake that function personally.

A structure that exposes the client to major tax liability while directing the economic benefit elsewhere is a danger signal that requires a more thorough tax analysis. Attorney Hall did not provide that protection, and his mother did not learn of the asserted tax liability until much later. The timing of that advice also creates a problem because the advice was not given in the first year affected by the receipt of payments. Thus, the advice, even if it had been correct, was negligently delivered as it exposed the taxpayer (Ethlyn) to a tax assessment requiring interest payments and penalties.

The malpractice in structuring the leases includes not only conflict-of-interest violations and self-dealing, but also failure to structure or document the transactions in a way that responsibly addressed foreseeable tax consequences to the client.

Tax law can be complicated. If a non-tax lawyer provides tax advice and does not consult tax experts, the negative consequences for the taxpayer can be significant.

A further example of the problem with Attorney Hall's analysis can be found in the letter he wrote to his mother on February 1, 2011. See Plaintiff Exhibit 73 from Attorney Hall's deposition. Without legal authority, he just decided on his own who should pay the income tax on the payments received from the 75-year lease. Private attorneys lack authority to reassign statutory tax obligations by private letter; tax liability follows the income to its legal owner under the Code and assignment-of-income rules, not subjective allocations of economic benefit. This

attempted reallocation provides no defense against BIR assessment and underscores the problematic nature of Attorney Hall's overall tax analysis of the transaction.

During his deposition, at one point he calls the pecuniary benefit he received a gift. If it was a gift of approximately $800,000.00, then a gift tax return should have been filed by Ethlyn, even if no gift tax would ultimately have been due.

Attorney Hall's tax advice is also vulnerable on timing. Even if one assumed arguendo that the $800,000 lease consideration could be characterized as capital gain, the documents suggest that the economics of the deal were not confined to a single year but were instead paid and performed over a multi-year period. Under basic installment-sale principles, a taxpayer receiving deferred payments generally must analyze whether gain should be recognized as payments are received rather than reported in full in the year the arrangement is made. Hall's February 2011 letter does not reflect that analysis. Instead, it assumes a single-year capital gain and then allocates that amount among family members, without addressing whether the payment stream required apportionment over several tax years. That omission is significant because it reflects not merely a debatable judgment call, but a failure to analyze the timing and character of the income under the governing tax rules.

Some of the income was realized during tax year 2009 and earlier. Thus, by the time Attorney Hall notified Ethlyn in 2011, she would not have known to report the 2009 income on her 2010 tax return (or the earlier years' income in the appropriate tax year) and be exposed to penalties for failure to report and failure to pay the tax owed on that income. There is no support in the materials I have reviewed for treating the cash payments as capital gains. A capital gains tax would be due if the property was sold or if the transaction was treated as a sale. Taking the position that the taxes owed were due to a capital gain and not ordinary income, would result in the client (Ethlyn) underreporting the income from the then-correct income tax rate of 35% to 15%, which would have resulted in an underpayment to the BIR of at least $214,000.00.

If Attorney Hall genuinely misunderstood the law or negligently assumed "this is a capital gain" without adequate research, it is legal malpractice and does not require an intent to defraud the VI Government. Why? Because as the attorney handling the transaction:

1.  he had a duty to provide competent representation;

2.  the tax advice fell well below what a reasonably competent tax attorney would have done under similar circumstances; and

3.  the bad advice or tax characterization caused, and would result in, damages to the client.[2]

---

[2] But the situation is much more serious if Attorney Hall knew the law required treating the amount as ordinary income and knowingly structured or described the transaction to conceal that fact and defeat the tax. If that is the case, his actions might subject him to criminal tax evasion. Note, his intent is an issue for

The manner in which he obtained an "opinion" from a CPA that this was capital gain and not ordinary income led to the CPA giving incorrect tax advice. Attorney Hall did not ask how the income should be treated. Here is what he wrote to an accountant: "A long term (75 year) lease was *sold* in 2010 by my mother on land she owns in St. John and generated income of $1,070,000. Am I correct that she has to pay a capital gain of 15% on the capital gain?" This was wrong, because Ethlyn Hall did not sell the lease. Attorney Hall's question misrepresents that there was a sale of an asset by the asset owner and also misrepresents the timing of the income as some was received in 2009 or earlier. However, the 75-year lease was a new lease. The original tenant wanted out of the 50-year lease and found somebody to relieve him of his obligations by entering into the new 75-year lease. The lease the original tenant had was cancelled, not sold. And if, for some reason, it was considered a sale, it would have been a sale between the original tenant and the subsequent tenant. However, instead of a sale, there exists a purported release and none of the relevant documents specify that there was a sale of an asset. If there is no sale of an asset by Ethlyn Hall, there is no capital gain event, and reducing the lawfully owed tax by mistakenly calling it a sale was, at a minimum, improper advice and exposed her to an underpayment of tax claim from the BIR with associated penalties and interest.

## Accounting and funds

Attorney Hall had and has a fiduciary duty to account fully for all money and value paid directly or indirectly under either lease and to restore any portion of that value that was diverted to his own benefit without fully informed consent, independent advice, and proper authority.

The tenant paid substantial sums and construction-related value under the 75-year lease; later began transferring funds to Attorney Hall personally; and at some point, some funds that should have been associated with construction obligations for Ethlyn's intended family beneficiaries were redirected toward Attorney Hall's own house. When an attorney and fiduciary receive client-related or transaction-related funds into a personal bank account, use them in connection with projects from which he personally benefits, and do so while occupying a position of trust over an elderly family member who is also his client, the law treats the transaction as presumptively suspect.

Undue influence is a serious concern whenever the fiduciary occupies both a position of trust and a position of dependency or dominance, and then benefits from a transaction he structured or documented himself. Here, based on the assumptions provided, Attorney Hall was not merely a relative who received a gift; he was the lawyer, the drafter, the manager of the money flow, the purported attorney-in-fact, and the person seeking to protect and preserve the benefit to himself. In my opinion, those facts create a strong presumption that any value redirected to Attorney Hall

---

the jury and I cannot make any conclusions based on the material I have reviewed. Regardless of his intent, however, his tax advice fell below the standard of care necessary for legal practice.

20

under either lease structure was procured under circumstances of fiduciary overreach unless proven otherwise by clear evidence of fairness, disclosure, and truly independent consent.

That is why the accounting obligation is central. A fiduciary who handles other people's money must maintain records sufficient to show what was received, why it was received, where it was deposited, how it was disbursed, who benefitted, and under what authority each expenditure occurred.

Ethlyn later asked Attorney Hall for an accounting of her financial obligations and the status of the lease, and he failed to provide the requested information or file materials.

That refusal itself constitutes a serious breach of professional and fiduciary duty. The right to an accounting is not optional when the lawyer-agent has received and controlled transaction proceeds that may belong to, or have been generated through rights belonging to, the client.

The personal FirstBank account structure is also professionally indefensible. Funds of this nature should have been kept in a segregated fiduciary, escrow, or trust arrangement with transparent records, not commingled in a personal account controlled by the attorney-beneficiary.

Because the funds were allegedly used at least in part for Attorney Hall's own residence, the law requires that he account for every dollar and every in-kind item of value traceable to the leases and return all amounts for which he cannot demonstrate lawful authority, informed consent, and fairness.

That conclusion does not depend on proof that every dollar was stolen or intentionally misappropriated. It follows from the fiduciary rule that self-benefiting uses of client-related funds are presumptively improper when the fiduciary created the structure, controlled the accounts, and failed to provide a transparent accounting.

**Second accounting obligation**

It is my opinion that Attorney Hall had and has an obligation to account for, and absent proof of proper authority and fairness to restore, all money paid under the 75-year lease transaction.

The 75-year lease was itself a transaction created, drafted, negotiated, executed, and implemented by Attorney Hall simultaneously acting as attorney, attorney-in-fact, negotiator, payee, and beneficiary.

On the assumptions supplied, the $800,000.00 lump-sum payment was to be made to Attorney Hall as landlord's agent and attorney-in-fact, and it was in fact paid into his personal FirstBank account over time.

That structure is fundamentally inconsistent with the duties owed by a lawyer and fiduciary. When the attorney designs a transaction so that the proceeds of the client's asset are paid to him personally and then used for projects benefiting himself and another family member, the attorney has an ethical and fiduciary obligation to account to his client.

21

The fact that Attorney Hall also cancelled the earlier 50-year lease by use of the power of attorney reinforces the conclusion that the 75-year lease cannot be treated as an ordinary third-party deal implemented for the client's sole benefit. It was a conflicted restructuring under the control of the person who stood to gain from it.

The 75-year lease replaced a prior arrangement that included specific third-party-beneficiary rights and possible penalty rent, and Attorney Hall declined to seek releases from the earlier beneficiaries because he apparently takes the position that his mother alone controlled cancellation. There is no support in the lease terms for that position, and based on Attorney Hall's angry communications with Phyllis, this appears to have been driven by his view of the equities rather than a faithful execution of his duties as an attorney to analyze the contract obligations. This underscores the professional conflict. A fiduciary who stands to gain from extinguishing existing obligations and beneficiary interests must not be the one unilaterally deciding, drafting, and executing the new arrangement on behalf of the principal without independent protection for the principal.

The tax consequences reinforce rather than diminish the accounting obligation. Since the lump sum payments were ordinary income rather than capital gains, the tax advice was faulty.

A lawyer structuring such a transaction had a duty either to competently address the foreseeable tax consequences or to require specialized tax advice before proceeding. If the structure chosen caused substantial tax exposure to Ethlyn while channeling the economic benefit elsewhere, that is further evidence that the transaction was not responsibly structured in the client's interest.

For the same reason, the later movement of money from Attorney Hall's personal account into a law-firm trust account for alleged tax purposes, followed by the subsequent release of part of that amount for Yassin's construction use, is troubling from a fiduciary standpoint. Those actions reflect continuing control by Attorney Hall over funds tied to the lease transactions and continued use of those funds in a manner not transparently aligned with Ethlyn's interests.

Attorney Hall's position is that money he received to finish his house from his mother is a valid gift and is evidenced by a document with her signature on it. Yet Attorney Hall knew or should have known that in such situations he had a duty as an attorney to advise her to seek independent counsel first. By analogy, he demonstrates this principle when he discusses a draft trust, he presented her with. Attorney Hall testified that he believed his mother's intention was to die intestate and have her property distributed through the laws of intestate succession. The example he gave that led him to that conclusion was the following: "I provided her with a draft trust that she could go to a lawyer to discuss with or give her some idea of what a trust is and how it would work." Thus, Attorney Hall knew that the proper procedure when dealing with potential conflicts of interest on such matters was to advise her to seek outside counsel.

The reasonable inference to draw from this is that he advised her to seek outside counsel because he knew that he would be a beneficiary of the trust and, therefore, she should be advised to seek

22

independent counsel. Ergo, his duty was to advise her to seek independent counsel with respect to the $800,000 benefit he received during his representation of her. Note that what has been marked as Exhibit 93, the document apparently signed by Ethlyn Hall permitting Attorney Hall to use funds from the lease to complete his house, was prepared by Attorney Hall according to his deposition. In that document there is no mention of any advice telling her to seek independent counsel. While the failure to include this in Exhibit 93 is not dispositive of the issue, it did present Attorney Hall with an opportunity to provide proof that he followed the dictates of the applicable conflict rules.

Note that the 75-year lease to the Talton Family Trust provides that the rent payment was to be a lump sum of $800,000.00, payable to Attorney Hall, as "agent and attorney in fact" for Ethlyn Louise Hall. Thus, the document that Attorney Hall signed clearly limited the lump sum payment to Hall in his capacity as agent and attorney-in-fact under the Power of Attorney for his mother. Of course, he also drafted the 75-year lease as his mother's attorney. As previously indicated in this report, if Attorney Hall was acting as agent and attorney for Ethlyn Hall, he could not have advised Ethlyn to cancel Phyllis' house project without committing malpractice.

Accordingly, all money paid under either of the lease agreements should be subject to full tracing, accounting, and restoration to Ethlyn's estate except to the extent Attorney Hall can prove, through proper records and legally sufficient authority, that specific disbursements were authorized, fair, and consistent with duties Attorney Hall owed to Ethlyn.

**Diminished capacity**

Attorney Hall claimed that his mother's mental capacity declined by late 2009. From the record I reviewed there is also evidence that Ethlyn's memory started failing as early as 2006. During the 2006-2009 period, she also had at least one fall that sent her to the hospital, and there is the suggestion that her eyesight was declining. In light of his own description of her mental state, he had additional obligations as her attorney and fiduciary that he did not fulfill.

By his account, Ethlyn began to exhibit cognitive decline in approximately late 2009, including confusion about basic historical events and suspicious beliefs about family members. At the same time, she was asking for information and an accounting of her obligations and lease status through letters dated August 27, 2010, and September 27, 2010, which Attorney Hall chose not to answer. In my opinion, once he both perceived cognitive decline and knew she was seeking to understand her affairs, a distinct set of incapacity-related duties arose. The fact that the probate court in Florida ultimately found that Ethlyn did not have diminished capacity does not forgive this breach of duty. If an attorney reasonably believes the client has diminished capacity, he should act cautiously, preserve the relationship as far as reasonably possible, and avoid using that vulnerability to advance his own interests.

From this record I cannot determine the extent of Ms. Hall's decline, but the issue is not necessarily whether Ethlyn was legally incompetent. The point is that Attorney Hall himself

23

described signs of decline and therefore should have proceeded cautiously, made sure all required disclosures were made, and responded to Ethlyn's requests for information.

**Governing legal framework**

Two overlapping bodies of law governed Attorney Hall's conduct in this period.

First, as Ethlyn's lawyer, he was subject to the ABA Model Rules as made applicable to attorneys in the Territory by the relevant local disciplinary framework. Those rules include duties to avoid conflicts of interest, to safeguard client property, and to address clients with diminished capacity in a protective manner. Among other things, the client-with-diminished-capacity rule requires the lawyer to maintain, as far as reasonably possible, a normal attorney-client relationship, and permits protective action only when the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial harm, and cannot adequately act in her own interests.

Second, as Ethlyn's attorney-in-fact under durable powers of attorney, and as the person controlling substantial lease-related funds, Attorney Hall owed classic fiduciary duties under agency principles. Those included duties of loyalty and prudence, a duty to avoid self-dealing, a duty to segregate and account for funds, and a duty to follow the principal's instructions in good faith.

**Conclusions**

Attorney Hall should have instructed Ethlyn Hall to obtain independent legal counsel before signing the August 3, 2007 reprogramming letter, the August 4, 2007 power of attorney, the lease assignment, and any document associated with the later 75-year lease structure that conferred a material benefit on him or placed his interests in conflict with hers.

Attorney Hall should have refused to perform legal work for Ethlyn Hall in any matter where he was simultaneously negotiating for his own benefit or attempting to preserve his own claimed gift or financial advantage.

The use of Attorney Hall's personal bank account for lease-related funds was not proper and inconsistent with accepted fiduciary practice.

A power of attorney does not authorize self-dealing unless such authority is clearly conferred and exercised only with full disclosure and informed consent. Attorney Hall's use of the powers of attorney to implement the 75-year lease and cancel the 50-year lease for a structure from which he benefitted was improper.

Attorney Hall had a duty to provide Ethlyn with timely information regarding income being received, the changed lease arrangement, the tax consequences arising from that arrangement, and the disposition of funds. Attorney Hall failed to do so.

24

25

Attorney Hall's later refusal to provide an accounting or file information after Ethlyn requested it was itself a breach of fiduciary duty and inconsistent with the obligations of both an attorney and an attorney-in-fact.

Whether Ethlyn subjectively intended to benefit Attorney Hall does not eliminate the conflict-of-interest problem. A fiduciary transaction may still be voidable or improper even if the principal intended a benefit, because the law imposes procedural and substantive safeguards precisely to ensure that such intent was formed and expressed free from overreaching, nondisclosure, and undue influence.

Respectfully submitted,

David Marshall Nissman
Dated: April 24, 2026