IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN


ELSA HALL, AS PERSONAL        )
REPRESENTATIVE AND AS         )
SUCCESSOR TRUSTEE OF THE      )
ETHLYN LOUISE HALL FAMILY     )
TRUST,                        )
                              )
                Plaintiff, )
                              )
        vs.                   ) CIVIL NO. 3:11-CV-54
                              )
SAMUEL H. HALL, JR. and       )
HALL & GRIFFITH, P.C.         )
                              )
                Defendants.)


DEPOSITION OF:

DAVID M. NISSMAN, ESQ.


DATE:

MONDAY, June 1, 2026
10:00 a.m. to 10:46 a.m. &
12:42 p.m. to 1:59 p.m.


PORTER'S COURT REPORTING, INC.
P.O. Box 11303
St. Thomas, Virgin Islands 00801

APPEARANCES:

        ANDREW C. SIMPSON, P.C.
        2191 Church Street, Suite 5
        Christiansted, St. Croix, VI 00820

            For Plaintiff

        KING & KING LAW P.C.
        BY:  ROBERT L. KING, ESQ.
        5043 Norre Gade, Suite 2
        St. Thomas, Virgin Islands 00802

           For Defendants


            ---


           INDEX

                    PAGE

EXAMINATION OF THE DEPONENT:

    BY MR. KING                  4


            ---

EXHIBITS

| DEFENDANT'S<br>EXHIBIT NO. | DESCRIPTION | MARKED |
|---|---|---|
| No. 1 | Biography and CV of Attorney Nissman | 7 |
| No. 2 | Notice of Deposition | 7 |
| No. 5 | Report of David Marshall Nissman | 15 |
| No. 6 | 2003 Lease (Ground Lease) | 23 |
| No. 7 | 2008 Lease (Amended Lease) | 43 |
| No. 3 | Original Complaint | 52 |
| No. 4 | Amended Complaint | 54 |

---

PROCEEDINGS

THEREUPON, DAVID M. NISSMAN, ESQ., being duly sworn, testified as follows:


DIRECT EXAMINATION


BY MR. KING:

Q.    Good morning, Attorney Nissman.

A.    Good morning, Attorney King.

Q.    We know each other obviously.  But for the purposes of the record, would you state your name?

A.    My name is David Marshall Nissman.  My last name is spelled N-i-s-s-m-a-n.

Q.    Present at this deposition I am present, Robert King.  I'm present on behalf of the defendant, Samuel Hall.

We also have present -- would you enter your appearance, Attorney Simpson?

MR. SIMPSON:           Andrew Simpson on behalf of the trustee.

Q.    So, Attorney Nissman, I know that you've taken depositions on many occasions, am I correct?

A.    Yes.

Q.    So is it fair for me to say that you understand the rules regarding the taking of testimony and the giving of testimony, correct?

A.   Yes, yes.  I have never been deposed but I have taken a lot of depositions.  I'm familiar with the rules.

Q.   And you understand the importance of giving truthful testimony and the importance of the oath and how depositions can be used, am I correct?

A.   Yes, sir.

Q.   Let's begin.  We've got your name.  Where do you live, Attorney Nissman?

A.   Well, I currently live in Puerto Rico.  I've lived in the Virgin Islands for 30 years.  I came here about 12 years ago because I had two heart attacks in which I had some trouble with.

Q.   Now are you presently engaged in the practice of law?

A.   Yes, but in a minor sort of way.  I don't have the volume of work that I used to have.  I really work more on kind of a consulting basis and as a litigator.  For example, sometimes I get hired as a consultant on litigation a lot.  Somebody hires me because they wanted somebody that has experience to handle RICO cases.

I get hired by businesses.  Right now, for example, I'm working with a company that is trying to provide a better health insurance product and lower the healthcare cost in America and in the territory.

So what I'm doing for them is right now I'm doing

sort of consulting work on legal issues, like what is the status of the Virgin Islands?  What is the status of Puerto Rico?  How does that play, Rule 125 apply to the Virgin Islands, things of that nature.

So I'm still involved in the practice of law but not as directly as a litigant.

Q.    Now I was given a biography of you.  Can you put that up, Attorney King?

(Pause)

Q.    Now, Attorney Nissman, I was given this biography of you.  Do you have a CV rather than this biography?

A.    No.

Q.    Because this biography is missing a lot of the information.

A.    No, but I'll go through it with you.

Q.    The point is I don't want to go through it.  Once I've got a copy of your CV, your most current CV, there is no need for me to go through this line by line and lengthen the deposition unnecessarily.

A.    I have like a one or two page resume that doesn't have as much information.

MR. KING:                    I'd like that.

Attorney Simpson, can we agree that that will be submitted to the court reporter and that will be along with the biography, Exhibit No. 1 to this deposition?

MR. SIMPSON:              Sure.

MR. KING:              Nicole, you can take that off the screen.

(Defendants Exhibit No. 1 marked for identification.)

BY MR. KING:

Q.    Attorney Nissman, did you bring any files with you to aid you in giving testimony today?

A.    No, but I have a folder on my hard drive that has the material in it that is cited in my report, those things that were furnished to me.  For example, Attorney Hall's deposition and all of the deposition exhibits I have a whole file folder of those things.  I didn't print anything.  I'm not accessing anything.  I can if you want me to.

Q.    In other words, what you have, you have in an electronic format; is that fair?

A.    Yes.

MR. KING:              Nicole, can you put up the Notice of Deposition?

Court Reporter, this will be Exhibit 2, the Notice of Deposition.

(Defendants Exhibit No. 2 marked for identification.)

BY MR. KING:

Q.    Attorney Nissman, this is the Notice of Deposition.  Do you recognize it?

A.    I do.  I do.

Q.    If you'll go to the second page, there are a number of items that we have requested that you produce in this deposition.  Do you have items on the folder that you electronically maintain that would respond to these requests?

A.    I'll say "yes".  I don't know if it will respond to all of them but I do want to tell you one thing.  We did try to start uploading to the link that you gave us.  I was sending e-mails that, you know, exchanges between Attorney Simpson and I that would be part of what you were asking for and he was not able to upload them.  You might want to talk to him about that.

Unfortunately, I think you know this, that when this was sent out, my son was celebrating his 30th birthday. We had rented a bareboat charter.  So I was actually in the neighborhood during the time this happened but I wasn't able to get any of that stuff until this weekend.

Saturday I was sending those e-mails to Attorney Simpson.  He told me yesterday that, he sent a text yesterday saying he had tried to upload them and there was a broken link or I would say a broken link.

Q.   Attorney Nissman, can you respond to those requests by sending them to the court reporter, which will be marked as Exhibit 3 to this deposition?

A.   Attorney King, I'll tell you what I would prefer to do, if it's okay with you.  I'd like to send them through Attorney Simpson first.  He indicated to me that he thought some of those communications might be privileged.

So I would like you and him to work that out.  And if that's okay with you, I'm happy to do it.

Q.   I don't see how they would be privileged since there is no attorney/client relationship.  But if you want to check with Attorney Simpson, that's fine.  My view is that they should be produced.

A.   We can go through them right now.

Q.   I'm trying not to do that because I don't really, even if you had brought them, I would not have gone through them item by item.  I would have merely had you state that these are the items that are in response to our request.

A.   Well, I'll be happy to do that.  I'll send it through him.  But I'll make that statement that if you would like to, I am responding to the items.

Q.   Yes, and then forward it to the court reporter and she will use them as the next exhibit.

MR. SIMPSON:          He'll forward them to me and I will forward them to the court reporter.  Not

everything you requested is discoverable.  But we will produce what's responsive and discoverable and not privileged.

MR. KING:                    Okay, we'll argue over the other portion, Andy, and I understand that.  That's what lawyers do.

BY MR. KING:

Q.   Now, Attorney Nissman, you've been named as an expert in this case.  And when I say this case, this is the case of Elsa Hall as personal representative of the Estate of Ethlyn Louise Hall and as successor trustee of the Ethlyn Louise Hall Family Trust versus Samuel Hall, Jr. and Hall & Griffith.  You recognize that, am I correct?

A.   Yes, sir.

Q.   Sir, without me going through your CV, which I don't have in front of me, can you tell me what areas that you say that you are an expert?

A.   Well, irrespective in this case on ethics.

Q.   Yes.

A.   So basically here's my experience.  I've been a practicing attorney for 48 years, most of that time in the Virgin Islands.

MR. SIMPSON:                 Excuse me, Attorney Nissman, he asked you what you are purporting to be an

expert in, not your expertise.

A.   Right, okay.  So on ethical issues of attorneys.

Q.   Is there any other area that you claim to be an expert?

A.   Well, not irrespective to this case.  But I have been an expert on different issues, economic development in the territory.

Q.   I mean with respect to this case.

A.   No, no, that's it.

Q.   So your expertise is, according to you if I understand it correctly, on ethical issues concerning attorneys, am I right?

A.   Yes.  Fiduciary duties as well because that's part of it.  So fiduciary duties as it applies to attorneys.

Q.   We're having a hard time hearing you.

A.   Oh, I'm sorry.  Is this better?  Can you hear me better now?

Q.   That's much better.

A.   So I would also say that I'm an expert on fiduciary obligations of those that apply to attorneys. They also apply to other entities.

For example, if you are on the board of directors of a company, you have fiduciary duties to the company.  So there is a little bit of an overlap.

Q.    Do you hold yourself out as an expert in real property law?

A.    I haven't really thought about that.  I've done a bunch of real property transactions.  But I don't know that I would consider myself as much of an expert, for example, as Attorney Hoffman.

Q.    Do you consider yourself an expert in contracts?

A.    The same answer.  I've been dealing with contracts as a private lawyer for 20 years.  I don't know whether that makes me an expert or not but I have experience in it, though.

Q.    Do you claim to be an expert in tort?

A.    I'll say the same thing.  I've handled a whole bunch of tort cases.  I don't know whether that makes me an expert or not.  I don't mean to be difficult.  I'm just saying these are first impression questions.

Q.    I'm sure.  And a lot of the questions that I'll ask you I'm sure will be first impression questions.

Do you consider yourself to be an expert in legal malpractice?

A.    Well, I believe that I am an expert in legal malpractice, yes.

Q.    Have you ever been recognized by any court of law as being an expert in legal malpractice?

A.    No.

Q.   Have you ever been recognized by any governmental agencies as being an expert in legal malpractice?

A.   I'll answer that question "yes" because -- well, let me tell you why I answered it and you decide whether that's sufficient or not.  But you know I was appointed as the publisher for the Department of Justice in 1995 and one of the first things that we did was we published an ethics manual for the Department of Justice.  I also was the editor-in-chief of a magazine on legal ethics.

So maybe legal ethics, yes, malpractice, no, to your point.

Q.   Do you hold yourself out to be an expert on property law?

A.   No.

Q.   We've all had property law in our first year of law school, am I right?

A.   Yes.

Q.   And it was the bane of our existence, am I correct?

A.   Very difficult.

Q.   So let me ask you some other background questions.

A.   Okay, sure.

Q.   Have you ever met Ethlyn Hall?

A.   No, I have not.

Q.   So I can take it by that you didn't know her personally and never had any conversations with her; is that fair?

A.   To my knowledge.  The only reason I hesitate there, when I was the U.S. Attorney I met a lot of people. But I don't have any recollection of meeting her specifically.

Q.   You don't have any recollection of ever discussing with her any of the facts or issues with respect to this case; is that fair?

A.   I'm certain I did not speak to her about this case.

Q.   Is it also fair to say that you've never read any of her testimony concerning the facts of this case?

A.   I have not read any of her testimony.  I have read the complaint in the case.

Q.   We'll get to that.

A.   Okay, all right.  Her testimony on that issue, no.

Q.   No, not on that issue.  Have you ever read any testimony from Ethlyn Hall with respect to the facts of this case?

A.   No, I have not.

Q.   And by testimony I mean deposition testimony or any court testimony of Ethlyn Hall?

A.    My answer is the same.  I have not.

Q.    Nicole, can you put up the opinion of Attorney Nissman.

Now let me ask you one more question.  Is it fair to say that the only actual knowledge that you have concerning Ethlyn Hall would be that knowledge that you obtained from Attorney Simpson or from testimony of others?

A.    Yes, I want say it this way.  From the representations that were made by Attorney Simpson, which is in my report, and the documents that I read associated with this case.

MR. KING:                What's the next exhibit, Nicole?

MS. KING-RICHARDSON:      This is the report of David Marshall Nissman.

MR. KING:                I know, the exhibit number.

MS. KING-RICHARDSON:      Exhibit 5.

(Defendants Exhibit No. 5 marked for identification.)

BY MR. KING:

Q.    Attorney Nissman, I'm showing you what has been marked for purposes of this deposition as Exhibit No. 5.  Do you recognize this exhibit?  Can you show it to him each

page at a time, please?

And, sir, do you have a copy of this in your presence?

A. I don't have it on the screen but I could pull it up if you want me to.

Q. Why don't you pull it up for yourself. I'll have this on the screen so that we can talk.

A. Well, do you want me to look at this first to authenticate it?

Q. Yes.

A. So far it's accurate.

Q. So let her know if you need her to slow down.

A. I mean I don't know. If you represent to me that this is the report that Attorney Simpson sent me, I'll accept that because I wrote it.

Q. I want you to be able to identify it.

Let me ask you this. The report that you wrote, did it consist of 25 pages?

A. I believe so.

Q. Do you see a page number there?

A. And that's my signature.

Q. Do you see a page number there?

A. Twenty-five.

Q. So it consist of 25 pages, am I right?

A. Yes, sir.

Q.    And is it signed at the end by you?

A.    Yes.

Q.    And it is dated April 24, 2026, am I right?

A.    Yes, sir.

Q.    Go to the front page, Nicole.  Your report is broken up into several sections, am I correct?

A.    Yes, sir.

Q.    The first section is on Retention and Assignment, am I right?

A.    Yes.

Q.    The next one says Documents Relied Upon, right?

A.    Yes.

Q.    The next one says Background Provided by Counsel for Trustee?

A.    Yes.  That one is a lot of pages.

Q.    That one consist of basically pages from page one through page seven, am I correct?

A.    Yes, and then after that Assumptions Relied Upon.

Q.    We're getting to that now.

On the bottom of page seven of your report are Assumptions Relied Upon, am I correct?

A.    Yes, sir.

Q.    Those assumptions relied upon are also assumptions based upon information provided to you by the trustee, am I correct, the attorney for the trustee?

TRANSCRIPT BY PORTER'S COURT REPORTING, INC. (340) 775-2428

A.   By the attorney for the trustee, yes.

Q.   And that goes from page seven --

A.   To ten, to the bottom of page ten.

Q.   To the bottom of page ten, am I correct?

A.   Yes, sir.

Q.   The next section of your report states that you have not testified as an expert at deposition or trial in the past four years?

A.   That's correct.

Q.   Have you testified as an expert or deposition -- excuse me, an expert in deposition or trial in the past ten years?

A.   No.

Q.   The next section of your report is labeled Compensation?

A.   Yes, sir.

Q.   And the next one is Governing Duties, am I correct?

A.   Yes, sir.

Q.   The next one discusses the 75-year lease?

A.   Yes, sir, that's correct.  That's on page twelve.

Q.   I note that you don't discuss the 50-year lease?

A.   That is true.

Q.   Why?

A.   Well, you know, I really did not see anything

problematic in the conduct concerning the 50-year lease. It had the execution of the lease. Events after that may be different. But I'm just telling you that in terms of the written lease, I did not.

Q. Okay, so you don't discuss the 50-year lease. You discussed the 75-year lease because you said you found things that were problematic with the 75-year lease, am I correct?

A. Yes, but part of it -- well, let me just be a little accurate.

Q. We're going to talk in depth. I'm just doing generally now.

A. Oh, I understand. But there were things that I took from the 50-year lease in my analysis.

Q. I understand. You read it but you didn't put an entire section that says 50-year lease, am I correct?

A. Right, I did not.

Q. But you have an entire section that says 75-year lease, am I right?

A. That's correct.

Q. Let me see where I was. That discussion, 75-year lease, goes from page 12 to page 20, am I correct?

A. Yes.

Q. And the next caption on your lease is Accounting and Funds?

A. Yes.

Q. And that would go from page 20 to 23, am I correct?

A. Yes, I'm looking at page 21 right now.

Q. No, I'm sorry, 20 to 21.

A. Yes, correct.

Q. The next caption says Second Accounting Obligation and that would be page 21 to 23, am I correct?

A. Yes.

Q. Your next caption would be Diminished Capacity?

A. Yes.

Q. That would be page 23 and the top of 24?

A. Yes.

Q. Am I correct?

A. Yes, sir.

Q. Your next caption would be Governing Legal Framework?

A. Yes.

Q. And followed by your conclusions --

A. Yes, sir.

Q. -- at page 25; is that correct?

A. Yes.

Q. You acknowledge that we've discussed this as being the report that you prepared, your expert report prepared in this case?

A.   Yes.   The only thing that I would say, the question you asked me about the 75-year lease finishing at page 20, that section does appear on page 20.  But on the subsequent pages concerning other issues, the 75-year lease is still the subject of those other discussions that's also on page 20 to 25.

Q.   All right, that's fair.  The opinion, the written opinion that you have up as Exhibit 5 -- is that Five, am I correct?

A.   Yes, it's Five.

Q.   Exhibit 5 is that a complete statement of all the opinions that you intend to express in this case?

A.   Yes.

Q.   And does it provide the basis and reasons for those opinions?

A.   I hope so.  I believe so.

Q.   It does consider -- it does contain the facts or data considered by you in forming those opinions, am I correct?

A.   Yes.

Q.   Let's go to the assumptions relied upon, Nicole, at page seven.  No, before assumptions relied upon, go to background of the opinion.

You've got here -- go back up to the top of it. Can you see that, Attorney Nissman, where it says background

provided by the trustee?

A.   Yes, sir.

Q.   Sir, you've got here background provided by the trustee, by counsel for the trustee.  How did he provide you this information?

A.   He sent it to me by e-mail and I think maybe there was also a link somewhere where I was able to download those documents that --

Q.   You are fading away.

A.   He sent it to me electronically.

Q.   Is this a verbatim entry of what was sent to you by the attorney for the trustee?

A.   Yes, at least I hope I was accurate that way but that is what I did.  I cut and pasted what he gave me into my report.

Q.   Because you broke up I'm going to try to repeat what you said.  That you basically in putting this in your report you cut and pasted verbatim into your report; is that fair?

A.   Yes.

Q.   Let's go to the next section, which says assumptions relied upon, that would be at page seven?

A.   Yes.

Q.   Now this assumption can you enlarge that a bit, please?

TRANSCRIPT BY PORTER'S COURT REPORTING, INC. (340) 775-2428

This assumptions relied upon paragraph, the caption assumptions relied upon, you said that, it says here counsel for trustee informed me that he reasonable, I guess it means reasonably.

A.    Reasonably, yes.

Q.    Reasonably expects to prove the following at trial and that I may therefore rely upon the following assumptions.  Was this also a cut and paste from something written by counsel for the trustee?

A.    I believe so.  This is accurately what the assumptions are that he gave me.  I can't recall how I put it in.  I know that I received these things electronically and I put them into my report and tried to be accurate in terms of that.

Q.    Now I want to come back to this other area. Let's go to the -- Nicole, can you put up the 50-year lease, the 2003 lease.  It would be Exhibit 6 I think it is.

(Defendants Exhibit 6

marked for

identification.)

Q.    Sir, did you have a chance to review the 2003 ground lease?

A.    I did.

Q.    And were you able to identify the parties to that ground lease?

A.   No, I just saw this this morning.  I don't have full recall.

Q.   I'm not going to make you have total recall.

Nicole, can you go to the final page of this -- oh, no, go to the first page of the lease.  Okay, stop right there.

Now this is the lease that was entered on the 24th day of January 2003.  You understand that?

A.   That's what the paper says, yes, sir.

Q.   And it's what's been represented to you by counsel for the plaintiff as the ground lease that was entered in 2003, am I correct?

A.   Yes, and also it's referenced as the 50-year lease in the testimony in the other documents.

Q.   And the lessor to this lease is Ethlyn Hall, am I correct?

A.   Yes.

Q.   This is the person who you said you didn't know, am I correct?

A.   Yes, I didn't know any of the parties.

Q.   Right.  And the lessee herein is who?  It's kind of hard to tell, isn't it?

A.   Well, if you go down a little bit maybe I could see it.  But it's St. John --

MR. SIMPSON:              We can stipulate that it

was the Andrew St. John Trust.

Q.   Okay.  Now if you go to the last page of this lease, the pages are all initialed, am I correct?

A.   Yes, I mean they are all initialed.  I wouldn't recognize the initials to tell you the truth.

Q.   But they are initialed whether you recognize them or not, correct?

A.   Yes.

Q.   And the final page was signed by Ethlyn Louise Hall?

A.   Yes.

Q.   And it was witnessed by her daughter, Phyllis Brin, Phyllis Hall Brin?

A.   Yes.

Q.   And it was witnessed by her son, Samuel Hall, am I correct?

A.   Right.  I'm not familiar with Attorney Hall's signature but I see that it says Samuel.  I can read that part and I can read Phyllis Hall Brin.

Q.   What about it says it's also signed on behalf of Andrew St. John Trust, am I correct?

A.   Yes, and I think his first name is Jack.  The signatures are a little hard for me to read but I think that they are the signatures of the people.

Q.   The signatories of the lease?

A. Right.

Q. And the lease itself consisted of -- let me see the number of pages, please, Nicole.

A. It's 35 or something like that.

Q. Thirty-three, go ahead.

MS. KING-RICHARDSON: This is 35.

Q. Would we say 35 pages? Would you agree with that?

A. Yes, I say that because that's what the table of contents also said.

Q. Okay. Now when this lease was entered, we can tell by the content of this document that Ethlyn Hall was making a gift, am I correct?

A. Yes, I believe that to be the case. She was making a gift of having buildings built on two parcels of land that she has deemed to be gifted pursuant to the asset.

Q. She was giving a gift to the natural objects of her bounty; is that fair?

A. That is fair.

Q. She's giving a gift to Yassin Hall, who is her granddaughter?

A. Correct.

Q. And she is giving a gift to Phyllis Hall, who is her daughter, am I correct?

A. Correct.

Q.   And this gift took place upon the execution of this lease, am I right?

A.   Yes.  To me it appears to be a completed gift.

Q.   I agree with you it's a completed gift and the gift was completed on the date that this lease was executed, am I correct?  We are in agreement?

A.   Yes, we are in agreement.

Q.   Now the tax obligations on that gift were created on the day that this lease was signed; is that correct?

MR. SIMPSON:            Object to the form.

Q.   You can still answer it.

A.   I think that's correct.

Q.   If there was any malpractice on the part of Mr. Hall, it would have accrued on this date or before, am I correct?

MR. SIMPSON:            Object to the form.

A.   Well, I don't have any reason to disagree with you on this.  I'm just thinking that the tax issues --

Q.   We're going to come to all the other issues.

A.   It has more to do with advice on the tax issues. I don't see anything with the way this lease was drafted.

Q.   But my question is that any malpractice on the part of Mr. Hall would have accrued on the date of the execution of this lease or before, am I correct?

A.   I'm sorry, I don't mean to fight with you on

this. I'm just having a hard time with this because I'm not sure if that's correct. Certain things are put in place on the date of the lease I would agree with you there. I don't see any tax advice here. I don't see anything that he's doing that is malpractice in the drafting of this lease.

Q. So you would agree with me that you don't see anything in the drafting of this lease that constitutes malpractice, correct?

A. Right, that's my analysis. There is no assumptions or anything else that have been given to me. I need to just be a little careful about that because one of the things I'm saying in my report, and I don't know if this is communicated as accurately as I would like it to be, but I'm saying that, I'm basing this on the facts I've been given. That's typically what happens to expert witnesses.

In other words, examining, cross examining on being one is limited to the knowledge that the expert gave in the case, and I don't have all the knowledge. I have what was provided to me and that's why I spent ten pages laying that out.

Q. You have the information that was provided to you by the attorney for the trust and the estate; is that correct?

A. That's correct.

Q. This lease was for a period of 50 years, am I

correct?

A.   Yes, you are.

Q.   So that the gift that was given in 2003 was all the financial benefit from over that 50-year period, isn't that correct?

A.   From my understanding, yes.

Q.   And as you stated the gift was completed at the time that it was signed?

A.   Yes, she vest that gift in Yassin and Phyllis. And Attorney Hall codified that in Section 23.19 of the lease when he affirmatively created third party beneficiary rights in the two of them of benefits that they were to obtain in a contract.

Q.   Now there is no -- the interest of Ethlyn Hall that existed by virtue of this lease and by virtue of her ownership of the property, she still maintained an interest in that property, is that fair, beyond the 50 years?

A.   Yes, yes, yes.

Q.   Her interest was a reverse -- excuse me, a reversionary interest?

A.   A reversionary interest because the possession and title of the land would go back to her at the end of 50 years if she was still the legal titleholder during this entire time.  And she also could have had some rights here if the tenant did not perform.

Q.   So the rights that she had upon execution of this lease we both agree is a reversionary interest from our first year property class, right?

A.   Right.

Q.   So that the interest that she could give to her estate and to a trust would be the interest to receive the property at the natural termination of this lease; is that fair?

A.   Yeah, with one additional thing.  I think that the estate -- whatever rights she had in terms of enforceability would also extend to her, you know, to the trust.  If her reversionary interest went to the trust, then she would also, I believe, have had rights to enforce this contract.

Q.   It would be a right to enforce her reversionary interest, am I right?

A.   I'm sorry, my sense is that if the tenant did not perform, okay, that three people could have sued the tenant.  Pursuant to Section 23.19, the third party beneficiary, meaning --

(Audio Interruption)

MR. KING:              Let's go back on the record.

I have to go back to the point where we were discussing the reversionary interest of Ethlyn Hall.  So we

were discussing the 2003 lease.  When we discussed the 2003 lease you and I had gone through the lease and you had agreed that this was the lease that was entered between the parties and we talked about the parties.

And then we were talking about what interest each had and whether or not tax consequences existed from the time of the lease.  That's where we are going to have to start out again and I apologize to you.

THE WITNESS:            Don't worry about it.  I understand.

MR. KING:                Let us begin.

BY MR. KING:

Q.    The lease of 2003 Ethlyn Hall to bind that lease gave a gift or gave two gifts, am I correct?

A.    Yes, we concluded they were completed gifts.

Q.    And we concluded that they were completed gifts.  They were gifts that were made to the natural objects of her bounty.  They were made to Phyllis Hall and they were made to Yasmean (phon) Hall, correct?

A.    Is it Yasmean?  I see it as Yassin.  I'm not sure.

Q.    Maybe it's Yassin.  I think you are correct.  I think it's Yassin.

A.    Her granddaughter and her daughter.

Q.   Her granddaughter and her daughter.  And I believe that you testified that you didn't see -- something just happened.  Nicole, take that down, please.  I don't need it now, not yet.  We've got a long ways to go.

Her granddaughter, Yassin, and her daughter, Phyllis, you and I agree that it was a completed gift to them as of January 3, 2023, am I correct?

A.   Two Thousand Three.

Q.   Two Thousand Three, am I correct?

A.   Correct.

Q.   And that gift that was made on January 3, 2003 had tax consequences attached at the time of the gift, am I right?

A.   Yes, although I think that the taxable event is when money exchanged hands.  But the tax structure or the gift occurred at the time of the signing of the lease.  If no money came in in 2003, nobody had a tax obligation.

Q.   If he performed valuable work in exchange for the lease, that had a value, didn't it?

A.   Yes.

Q.   And that was money?

A.   Then there was a taxable event when that occurred and in subsequent years when that occurred.

Q.   So now the taxable event occurred in 2003 and in subsequent years when individual money was expended toward

the building of these homes, am I correct?

A.   Yes.

Q.   Now the lease agreement carried with it, gave with it certain rights to Yassin Hall and to Phyllis Hall Brin, am I correct?

A.   Correct.

Q.   They had the right to specific performance, am I correct?

A.   Yes, pursuant to 23.19.

Q.   I'm going to ask you to come forward so that she can hear you.

A.   Okay, I'll try to speak up more, too.

Q.   They have a right of specific performance and they could enforce the contract between their mother and grandmother respectively and the tenant, am I correct?

A.   Well, I thought as against the tenant.

Q.   That's what I said, against the tenant.

A.    But I think you also said against the mother.

Q.   No, no, I didn't say against the mother.  Let me rephrase the question because you didn't hear it properly.

Yassin and Phyllis Hall Brin pursuant to the terms of this contract had a right to enforce that contract as against the tenant, am I correct?

A.   Correct.

Q.   They had the right to proceed by way of specific

performance, am I correct?

A.    Yes.

Q.    Miss Ethlyn Hall also had a contractual right against the tenant, am I correct?

A.    Yes, correct.

Q.    Her contractual right also could force, could force compliance with the terms of the contract, correct?

A.    Correct.

Q.    Or she could cancel the contract, am I correct, if he didn't perform and put him out of the premises?

A.    Well, yes, she has a right to bring an action for eviction.

Q.    Right.  The interest that the contract created in Ethlyn Hall was that of a reversionary interest, am I correct?

A.    Yes, as to the possession of the property.

Q.    As to possession of the property.

A.    As to incur enforcement rights under the contract I don't think I would call that reversionary.

Q.    I agree with you.  That is also called, so we are talking the same way, the right of reverter?

A.    Yes.

Q.    The right of reverter.

She agreed, Miss Hall, I said Miss Hall, Ethlyn Hall by signing this contract agreed that the property would

TRANSCRIPT BY PORTER'S COURT REPORTING, INC. (340) 775-2428

revert back to her 50 years under the 2003 lease, 50 years after the lease formation, am I correct?

A.   You are correct.

Q.   That would be the natural termination of that 2003 lease, am I correct?

A.   Correct.

Q.   Miss Hall, Miss Ethlyn Hall therefore maintained an interest which permitted her to transfer by will, by trust or by what other means to her estate or to other persons her right of reverter, to take title to the property at the end of this lease; is that fair?

A.   Yes.

Q.   Mrs. Hall, when I say Mrs. Hall I mean Ethlyn Hall by this lease gave up any right for her personal receipt of any of the rentals, am I correct?

A.   That's correct.  Because my understanding is that all of the money to be paid was to go to building the two houses that she had already completed the gift for her daughter and granddaughter.

Q.   Now you and I had come to a lot of agreements on this case more than I had expected.  We had come to the conclusion and agreement that there was a completed gift in 2003, correct?

A.   Correct.

Q.   You didn't find any problem or any malpractice

with respect to the lease of 2003, am I correct?

A.   As to the formation of it and the signing of it no problem whatsoever.

Q.   We had talked about the elements of negligence.

A.   Right.

Q.   And if there were negligence on the part of Attorney Hall, that negligence would have accrued either before January 3, 2003 or on that date, isn't that fair?

A.   As to the formation of the lease -- and I don't mean to fight with you on this.  Let me just explain my thinking so you understand where I might look back a little bit, is that later on with respect to events that happened if there is some allegation that he was in control of this and yet not all of the rental retainer or something like that, that's a different issue.  But if you're asking me what was the status at the time of signing that lease, I saw no malpractice whatsoever.

Q.   Now you have given us a hypothetical.

A.   Yes, because I'm not sure I have all the facts. That's why I'm trying to be careful.

Q.   But those facts aren't supported in this record that you have before you, correct?

A.   I'm not sure if his mother ever got accounting records during this period or the transactions or the payments that the tenants were applying.  I didn't see that.

I don't want to say he didn't do it.  I'm just saying I didn't see it.

Q.   The contract didn't require any -- when I say the contract, the lease of 2003 did not place a burden on Attorney Hall or on anyone else to make an accounting to Ethlyn Hall, did it?

A.   I saw no specific requirement in the contract.

Q.   So there was no contractual requirement for any accounting back in 2003 that you saw?

A.   Right.  When I say contractual issues I mean as to whether or not there was an ethical issue once she asked for these documents, that's a different issue.

Q.   You've got no evidence that Miss Hall asked for any documents in 2003, am I correct?

A.   No, no, I'm talking about later on.

Q.   Okay, but we're going to get to later on, later on.

In 2004 you don't have anything that says Ethlyn Hall asked for an accounting, am I correct?

A.   Right.  And I don't see anything until about 2010.

Q.   You don't see anything asking about accounting until you said about 2010?

A.   Somewhere around there.

Q.   And as you say, you did not have any conversation

with Mrs. Hall, Mrs. Ethlyn Hall, correct?

A.    I did not.

Q.    You did not see any deposition or testimony from Mrs. Ethlyn Hall, am I correct?

A.    Correct.

Q.    You did not see any trial testimony from Ethlyn Hall; is that correct?

A.    Correct.

Q.    Now in your opinion you talked about the possibility -- well, let me backtrack because I'm not there yet.

MR. KING:                Off the record.

(Off the record)

(Back on the record)

BY MR. KING:

Q.    Now we were talking about negligence and I asked you about the elements of negligence.  You had said that you didn't really remember them from the top of your head.  I told you that they were, I proffered to you that they were breach of duty, approximate cause and damages.

Do you recall that?

A.    I do.

Q.    We were talking about the 2003 lease and we were saying that -- and I was asking you if there was negligence in this case in 2003 and we assume a duty, and let's assume

a breach of duty, where would you find damages?

A.   Well, I think the only place that I could see damages is in the accountability.  And then we covered the fact that --

Q.   Okay, you've jumped ahead of me again because you knew where I was going.

A.   I'm sorry.

Q.   I understand.  In other words, you said the only person who had damages -- and that appeared much later on.  That was after the revocation of the gift -- would have been Phyllis, am I correct?

A.   Yes, that would have been Phyllis.

Q.   It was Phyllis because she got a partially built home?

A.   Right.

Q.   And she didn't get a fully completed home?

A.   Right.

Q.   You and I had agreed that the gift was complete in 2003 and there was nothing in the lease which gave Ethlyn Hall the right of revocation of any portion of that gift; is that correct?

A.   That's my opinion, yes.

Q.   If there was any damage as a result of a wrongful revocation of part of the gift, it would be solely as to Phyllis Hall, am I correct?

A.   Correct.

Q.   There would be no damage to Ethlyn Hall or her estate because they bargained for not receiving anything but a right of reverter after 50 years, am I correct?

A.   Correct.

Q.   We talked about how the original consideration for the 50-year lease changed.  Do you remember that?

A.   Yes, the houses were going to be built bigger than originally anticipated or contracted.

Q.   Yes, we looked at the allegations of the complaint and that would be the original complaint from Ethlyn Hall to Samuel Hall against Samuel Hall.

A.   Yes, that was paragraph 66 to 72.

Q.   Right, you reviewed paragraph 66 to 72.  No, let's go back.  Before we get there, that's ahead of us. That's ahead of us.

The first thing we did when we talked about this complaint we talked about that the scope of the work changed.  Do you remember that?

A.   Yes.

Q.   And that the houses that were going to be built by, built for Yassin Hall and for Phyllis Hall became larger.  They had a larger footprint, am I correct?

A.   Yes.

Q.   And that would require the expenditure of more

money than was anticipated by the original lease?

A.   Correct.

Q.   Is that correct?

A.   Correct.

Q.   The tenant wanted therefore to negotiate an increase in the term of the lease itself, from 50 to 100 years.  That's what you stated, correct?

A.   Yes, I saw an e-mail that Jack Andrews had written to Attorney Hall.

Q.   Eventually it was determined between the parties that the lease would be, that the lease would terminate 25 to 30 years later, right?

MR. SIMPSON:            Object to the form.

A.   To be exact my understanding that was a 75-year lease.  If you added the first six years that had already expired according to that lease, then we are talking about a total of 81 years.  That's my understanding.

Q.   Or if your understanding is incorrect, then actually from the date of the first lease it would be 75 years, am I correct?

MR. SIMPSON:            Objection.

A.   Sorry, I'm a little confused.

Q.   If the lease term was from January 3, 2003 and extended, it would be 75 years, am I correct?

A.   Correct.

TRANSCRIPT BY PORTER'S COURT REPORTING, INC. (340) 775-2428

Q.   So the interpretation of years just depends upon how you view those facts we talked about?

MR. SIMPSON:                Objection.

A.   Right.  And I wasn't really asked to determine whether it was 75 or 81 years.

Q.   Now, Nicole, can you put Exhibit No. 3 -- excuse me, Exhibit No. 6.  That's the 2003 lease.  I'm just going to have you identify it again.

A.   Okay.

Q.   Attorney Nissman, I am showing you what has been marked as Exhibit No. 6 for purposes of this deposition. Are you familiar with this document?

A.   Yes, and that looks like the first page.  I reviewed it again this morning before the deposition.  I believe it's about 35 pages long.

Q.   Yes.  Do you recognize this as being the 2003 lease as the same one you were shown this morning?

A.   Yes.

Q.   And this is the lease to which we were talking about where there was a gift from Ethlyn Hall to Yassin Hall and to Phyllis Hall Brin; is that correct?

A.   Yes.

Q.   Nicole, can you put up the 2007 lease, please?

I'm going to try to lead you so that we can get through this much quicker than we did before because I

already know the answers that you gave.

A.    We didn't look at this yet.

Q.    I know.  This we haven't looked at yet.

(Defendant Exhibit No.

7 marked for

identification.)

Q.    Sir, you are being shown what is marked as Exhibit No. 7.  Have you seen this document before?

Nicole, let him see it.

MS. KING-RICHARDSON:    You don't see the document?

MR. KING:                No, enlarge it.

MR. SIMPSON:             I think we can speculate that that's the 2008 lease.

MR. KING:                Okay, we can stipulate that that's the 2008 lease?

MR. SIMPSON:             Yes.

MR. KING:                Okay, stipulation accepted.


BY MR. KING:

Q.    Sir, this 2008 lease extends the time or as you say it might have added additional time depending upon the reading, am I correct?

A.    Correct.

MR. SIMPSON:           Object to the form.

Q.   And it's still a lease that gives a gift to the objects of Miss Ethlyn Hall's bounty, am I correct?

A.   You are correct.

Q.   And as we said, before you and I agree that the gifts that were made in 2003 were completed gifts in 2003, am I correct?

A.   Yes, they were completed gifts for purposes of transferring the property.  With respect to tax consequences it's a little bit different.  It doesn't affect the fact that the gifts are completed.

But as to when money would be owed to the BIR or the IRS, that would occur at the time that services were performed.  But the gift is complete in terms of a clear claim in property rights that goes with the house at the time the contract is signed.

Q.   Now we also agreed there may have been a dispute as to whether or not Ethlyn Hall retained the power to revoke the gift in whole or in part, am I correct?

A.   Well, I think you and I agreed on it.  In the 2003 lease she did not revert any power to revoke the gift.

Q.   I agree.  She did not reserve any power to revoke that gift.  She did, however, revoke that gift, isn't that correct, a portion of it?

A.   Yes.

Q.   And she reprogrammed a portion of that gift to the completion or to help the completion of a house that Attorney Hall was building, am I correct?

MR. SIMPSON:                  Object to the form.

Q.   But you can answer the question.

A.   The way I'll answer that is, yes, that was the document that I reviewed sure.  What do I mean by that? Well, there was a --

Q.   She's not hearing you because you keep going back in your seat.  So she didn't hear that answer.

A.   Let me say it again.  The documents I reviewed that were signed by Ethlyn purported to grant a power of attorney and also reprogram the gift.

So I'm saying based on the documents I reviewed, the answer to your question is "yes".  I know there is a dispute about the effect of those documents but many of those documents that's what they hold.

Q.   And let's assume for purposes of this question that Ethlyn Hall did not retain, which you and I agree, did not retain the authority to revoke any gift under the 2003 lease in whole and in part.

A.   Yes.

Q.   Let's assume, I want you to assume that she wrongfully revoked a portion of that gift by causing the construction on Phyllis Hall Brin's home to cease, who would

have a claim for relief?

A.    Phyllis Hall Brin.

Q.    Is it fair to say that the estate itself had no claim as a result of the ceasing of the construction on Phyllis Hall Brin's home?

MR. SIMPSON:              Object to the form.

Q.    You can answer it.

A.    I've got to think about that for a second.  On the revocation -- I'm sorry, can you repeat the question again so I answer it correctly?

Q.    Okay, sure.

I wanted you to assume that Ethlyn Hall did not have authority -- and we agreed she didn't have authority -- to revoke the gift to Phyllis Hall in whole and in part?

A.    Yes, I agree with that.

Q.    That she in fact reprogrammed a portion of that gift.  But that authority is not only with you, you and I believe it doesn't exist, but at most it was questionable.

A.    Okay, I believe that.

Q.    Who would be the only party that would be damaged by such an allocation or reallocation?

A.    Okay, this is where it gets a little complicated.  With respect to the house that wasn't completed, Phyllis would be the one.  To the extent that this changes Ethlyn's taxes, that's a little bit more complicated and it goes to,

it goes -- I don't want to say anything incorrect here, Attorney King, because I'm really focused here on the damages that occurred from what I consider to be inadequate advice concerning the taxes.

So on the issue of who would be the only one that could complain about the reprogramming of the house as to Phyllis, it would be Phyllis and not the estate. As to were there other damages caused by this, then I go to the taxes. So I'm just letting you know where my thinking is.

Q. Let's talk about the tax issue for a minute.

A. Okay, shoot.

Q. We said that there was a gift that was made in 2003.

A. Yes.

Q. And that was a taxable event, am I correct?

A. Well, the taxable event occurred at the time that money exchanged hands.

Q. And money exchanged hands beginning in 2003 when money was expended by the lessee, am I correct?

A. Correct.

Q. And a taxable event occurred every year that the person leasing the property expended money, am I correct?

A. Correct.

Q. And the amount --

A. With respect to the first lease, yes.

Q.    And the amount of that taxable event would equal to the amount that was expended by the lessee in building those houses or doing the foundation work or whatever he did during any individual year; is that correct?

A.    That is correct.

Q.    Now we talked about a lump sum payment being made in 2010 I think it was.

A.    I think it might have started in 2008 or '9, then the bulk of it was the next year.  But I think it went over into three years.

Q.    We were talking about whether or not how that payment would be allocated as income.  Do you remember that?

A.    Yes.  I think we were talking more about when it would be allocated.

Q.    That's what I mean, when it would be allocated as income.

A.    Yes.

Q.    It was your position that the IRS takes a firm view on those things and it would be asserting that when the $800,000.00 was received, that was a taxable event, am I correct?

A.    Yes, yes.  Let me tell you how.

They are going to consider that a lease payment. Even if it was a lease for many years, a lease payment was made in one year or a multiyear lease, they would consider

that income in the year that the bulk money was received, which is a little bit different than the way you were posing the question.  I'm not saying you are posing it incorrectly but you were suggesting that when they started building the foundation that's the other thing that was taxable.  That's true in the first instance exactly when the money was changing hands so to speak.

But in the second lease when all that money came in as a lump sum payment -- I know it was over a period of three years -- the IRS would say, okay, we're going to tax that, that's the moment that the money was received.

Q.   And we said that Ethlyn Hall was a cash basis taxpayer which most people are.

A.   I'm assuming that's correct.  That's how most people are.

Q.   And we had said that as a cash basis taxpayer you are taxed on your income as it is received, am I correct?

A.   Yes, in this case because of the lease in particular because they have rules about it.

Q.   You are not taxed as it accrues but as it is received as a cash basis taxpayer, isn't that right?

A.   Yes, yes.

Q.   We also talked about the fact that Ethlyn Hall had accountants who prepared her tax returns?

A.   Right, you told me about that.  I know nothing

about that.

Q.   You were not informed by counsel for the plaintiff that Ethlyn Hall retained accountants to prepare her taxes, correct?

A.   Right.

Q.   And you were not informed that Sam Hall never had anything to do with the preparation of the taxes, am I correct?

A.   You're correct.  And you also had talked about a specific accountant you asked me about.  That person's name I hadn't heard of.

Q.   Foster Baynes and Eric Baynes.

A.    Right.

Q.    That they had been her accountants for many, many years.  You've never been informed about that?

A.   Right, I didn't know them.

Q.   You also were informed that Phyllis Hall Brin in fact signed some tax returns on behalf of Ethlyn Hall?

A.   I don't believe I saw anything to that effect.

Q.   You did say you saw no evidence that Sam Hall prepared any tax returns for Ethlyn Hall, correct?

A.   Correct.

Q.   Now when the 2007 lease was entered, the gift -- let me put it this way.  Let me change it.

When the 2007 lease was entered, the duration of

the time that the lease would exist changed; is that correct?

A.    Right, by at least 25 years.

Q.    By at least 25 years.  How you count it, it might be 31, it could be 25.  But it's 25 years.

A.    Right.

Q.    The gift itself didn't change however, did it?

A.    You are talking about the --

Q.    Any of them.  The gift under this lease didn't change.  In other words the amount --

A.    The second lease changed.

Q.    Let me see if I can clarify.  The amount of the gift did not change?

A.    Well, I think it did because wasn't that the reason for the change in the lease?  Because now there was going to be a lump sum payment and I think payments according to Attorney Hall of a million seventy thousand would roll into 2010.  And according to the e-mail that I read from Jack Andrews on behalf of the Andrew Trust, that that was because the size of these houses had increased beyond what the parties originally contemplated.

So that's why I'm having trouble with your question.

Q.    I understand my question was imperfectly asked.

What was really changed with respect to the

interest of Ethlyn Hall, however, was the duration of the time that she would be without the right of revert -- be unable to exercise the right of reverter, am I correct?

MR. SIMPSON:                Object to the form.

Q.    Am I correct?

A.    Yes, you are correct.  I mean that's the only intervening thing if there had been a default.  But, yes, the document extends the time of which she will not have possession.

(Defendant Exhibit No. 3

marked for

identification.)

Q.    I had showed you -- I'm going to show you again a copy of the original complaint and that is Exhibit No. 3.

A.    Okay.

Q.    And this time I am going to direct your attention to paragraph 66 through 73.

Attorney Nissman, I'm showing you what has been marked as the original complaint that's filed in the case of Ethlyn Louise Hall, et al versus Samuel Hall and Hall & Griffith.  Do you recognize that?

A.    Yes, I recognize this as the same document.

Q.    This is the document that you reviewed, am I correct?

A.    Yes.

Q.   At Count I beginning on page 66 there is a claim there --

A.   At paragraph 66.

Q.   At paragraph 66 there is a claim for breach of fiduciary duty, am I correct?

A.   Yes.

Q.   Page 15 of that complaint paragraph 79 through 88 there is a claim for fraud, am I correct?

A.   Correct.

Q.   Now you said that, if I remember your testimony correctly, you said that you were not informed that these issues had already been tried before a jury?

A.   Well, I do not know whether it was a judge trial or a jury trial.  I reviewed an order that looked like a case that concluded and there was a judgement.

Q.   And that was the case in Florida?

A.   Yes.

Q.   Did you review any information or were you provided any information about a judgment in the Virgin Islands?

A.   You know I don't recall.  I'm sorry.  I know that there was a case and I know that -- and I'm not sure which case, but I know it went all the way up to the Supreme Court.  I read the Supreme Court opinion.

MR. KING:                Nicole, could you put up

TRANSCRIPT BY PORTER'S COURT REPORTING, INC. (340) 775-2428

Exhibit No. 4?

                              (Defendant Exhibit No. 4

                                marked for

                                identification.)

BY MR. KING:

    Q.    I'm showing you, Attorney Nissman, a document that has been marked as Exhibit No. 4.  Have you seen this before?

    A.    Not that I recall.  It could have been in those documents that I reviewed but I don't recollect.

    Q.    It's not listed in your report as one of the documents that you reviewed; is that fair?

    A.    Yes, that's fair.

    Q.    This is the amended complaint in the case of Elsa Hall as personal representative of the Estate of Ethlyn Louise Hall against Samuel H. Hall, Jr. and Hall & Griffith. I want you to look at page 10 of this complaint, paragraph number 56 through paragraph 63.  Take your time.

                    (Pause)

    A.    Okay, I have finished that count.

    Q.    This count alleges a claim for a breach of fiduciary duty arising out of attorney/client relationship, am I correct?

    A.    Correct.

    Q.    I want you to take a look at Count II.  That

would be from paragraph 64 to paragraph 71.

A.   Okay.

Q.   Now this Count II also alleges a claim for breach of fiduciary duty, am I correct?

A.   Correct.

Q.   You said you were not aware that this case was tried to a jury already, correct?

A.   Right, right.  I'm not sure what the proceedings were and the appeal to the Supreme Court.

Q.   Were you informed that the jury hearing this case found that there was no breach of fiduciary duty?

MR. SIMPSON:              Object to the form.

A.   No, I wasn't.  What I was told was that -- and I'm trying to be very careful.  I know that Attorney Simpson as to what happened he wasn't so much speaking about the jury as he was the judge's ruling.

Q.   Okay.

A.   That's all I know.

Q.   Were you informed by Attorney Simpson or were you given any document that was evidence that this case was tried before a jury and the jury found there was no breach of fiduciary duty?

MR. SIMPSON:              Objection to the form. That's mischaracterizing the proceedings.

Q.   You can answer the question.

A.    The answer is, no, I was not.

Q.    Were you informed that a jury hearing this case found that there was no unjust enrichment?

MR. SIMPSON:                Objection to the form.

A.    No, I was not informed.  I didn't know anything about a jury trial.

Q.    You were aware that this case, at least part of this case went up to the U.S. Court of Appeals to the Third Circuit, am I correct?

A.    Well, it would have had to.  But what I'm saying I was told that it went all, part of it went all the way up to the Supreme Court.  I did read what the Supreme Court had to say.  So I'm assuming that it went to the Third Circuit first.  That's how it would actually go.

Q.    Were you ever afforded a copy of the decision of the U.S. Court of Appeals to the Third Circuit?

A.    No, I wasn't.

Q.    Are you aware or have you been made aware by the attorney for the plaintiff that the U.S. Court of Appeals for the Third Circuit affirmed the jury's finding that there was no breach of fiduciary duty?

MR. SIMPSON:                Objection.  It mischaracterizes the state of the case.

Q.    You can answer the question.

A.    I wasn't informed of that.

Q.    Were you told or given any information concerning the Court of Appeals' affirmant of the jury's verdict finding that there was no unjust enrichment?

MR. SIMPSON:          Objection.

A.    No, I wasn't.

Q.    Were you informed of the jury granting a verdict in favor of Attorney Hall and Hall & Griffith that there was no fraud involved in this case?

MR. SIMPSON:          Objection.

A.    No, I wasn't.

Q.    Were you informed that the Court of Appeals for the Third Circuit affirmed the finding of the jury, that there was no fraud in this case?

MR. SIMPSON:          Objection.

Q.    I didn't hear your answer.

A.    I said "no".

Q.    Is it fair to say that you weren't given any information concerning the jury verdict on fraud, correct?

A.    Correct.

Q.    And you weren't given any information concerning the Court of Appeals' ruling with respect to the fraud?

A.    Correct.

Q.    Is it fair to say that you weren't given any information concerning the jury verdict regarding unjust enrichment?

A.   Yes, I was not given anything.

Q.   And you weren't given any information concerning the Court of Appeal's affirmant of the jury verdict concerning unjust enrichment?

MR. SIMPSON:          Objection.

A.   I was not, no.

Q.   And you were not provided any information concerning the jury verdict finding that there was no breach of fiduciary duty?

MR. SIMPSON:          Objection.

A.   I think you already asked that question.  The answer was I was not provided.

Q.   Sir, were you informed that one of the claims in this case was conversion?

A.   No.

Q.   Do you know what the elements of conversion would be?

MR. SIMPSON:          Objection, beyond the scope of his opinion.

Q.    That's okay, you can answer.

A.    Well, I won't cite the elements exactly in the way they were in the jury instructions.  What a conversion is that the defendants will have taken by one means or another converted property owned by another.  Usually there is a couple of rental spaces attached to that.  Of course

the order for it in the complaint happen to be damages.

Q.   Right.  Conversion requires a wrongful taking, am I correct?

A.   Yes, that's what I mean.  There is a couple of rentals attached to it.

Q.   And it has to be un-consensual taking; is that correct?

A.   Yes.

Q.   The elements also include an intentional -- excuse me, an un-consented to retention of property; is that correct?

A.   Correct.

Q.   You've already said that you never met Ethlyn Hall, correct?

A.   That is correct.

Q.   And you've never read a transcript of her testimony to any extent; is that correct?

A.   That's correct.

Q.   In absence of that, how do you find a lack of consent?

MR. SIMPSON:              Objection.

A.   Are you talking about the reprogramming now?  Is that what we're on?

Q.   I'm asking you generally.  In the absence of testimony from Ethlyn Hall about a conversion of any type of

property, how do you prove conversion?

MR. SIMPSON:                    Wait, wait, David.

Objection.  You are asking this witness for an opinion on an topic that he has not opined on.  If you want to waste your time, go ahead.

MR. KING:                    Thank you.  You don't have the right to make speaking objections.  You can object but you don't have the right to do all of that.  You know better.

THE WITNESS:                    Well, I got interrupted but here's what I was going to say; that I really didn't look at the conversion issue at all.  That wasn't part of the direction.

And, secondly, to answer your question hypothetical of how could one reach a conclusion on that issue, I agree.  But how could I reach that conclusion without having her testimony, I would say, well, we would do that all the time based on the totality of the circumstance, the circumstantial evidence.  I would go to -- and I'm not saying with the conversion.  So please don't think that I'm saying that.

But I think that with a lot of the events in the case that I got a lot of information from Attorney Hall's statements in his deposition as well as correspondence that he had with other people.

TRANSCRIPT BY PORTER'S COURT REPORTING, INC. (340) 775-2428

BY MR. KING:

Q.   And you just said you're not saying that there was conversion?

A.   No, I think there was.  It's not my job to decide damages.  But if you are asking me if there are some damages, I think I've answered that question.

Q.   No, you said there is none.  You said the damage would be on the part of Phyllis for not getting the completion of her house and what that would cost, am I correct?

MR. SIMPSON:          Objection.

A.   If in fact there wasn't a knowing consent to this reprogramming, then there is $800,000.00 of a benefit that went to somebody who may not intended to have that and that could be measurable.

Q.   Tell me something, is there any evidence that you have in your possession, in your knowledge that shows a lack of consent?

MR. SIMPSON:          Objection.

A.   Well, a lot of it has to do with --

Q.   No, the question is simple.  Is there any information to your knowledge, any testimony that shows that there was a lack of consent of Ethlyn Hall?

MR. SIMPSON:          Objection.  That's a compound question among other things.

TRANSCRIPT BY PORTER'S COURT REPORTING, INC. (340) 775-2428

Do you mean testimony?  Do you mean evidence? Are you limiting it to what he reviewed or the totality of the case that he hasn't reviewed?

Q.    Have you found any evidence in your review that showed a lack of consent?

A.    From the totality of the records that I reviewed, I think there are instances to be drawn as to whether or not she knew what she was signing when she signed the power of attorney in 2007 and '8 period and other documents that we could refer to.  Yes, there were witnesses to the power of attorney that she clearly signed the documents.

But throughout this thing even not looking at the complaint, but looking at some of the things he said, it's clear to me that at age 90 or so she was having difficulty reading that he had mentioned.  And then the complaint talked about how, you know, if there wasn't a 20-point type, she couldn't read it.  The documents I reviewed looked like a 12-point type.

So it's hard for me to say what really happened there.

Q.    You are tailing off.  She couldn't hear your answer.

A.    Okay, I'll go over it again.

So when I looked at those documents the ones that she signed, the power of attorney with respect to this

second lease, the document evidencing the gift, I saw writing that Attorney Hall made where he was saying that her eyesight wasn't so good.  I don't want to say failing but she was having difficulties.

And then the complaint also alleged that if it wasn't a 20-point type, she couldn't read it.  The documents I looked at looked like about a 12-point type.  I'm not giving you a conclusion whether it's 11, 12 but it definitely was not a 20-point type.

So I don't know whether when she has been given documents by a lawyer that has been representing her for 30 years whether she just signed them, whether he explained to her what was in the documents.  I don't have any information that she knowingly signed those documents intending to give him those benefits.

Q.   What you don't have is the testimony of Ethlyn Hall; is that correct?

A.   That is correct.  It would be helpful I would agree on that issue.  But what you are asking me is that in the absence of that, how could we say there is a possibility of damages.  I'm explaining to you what I saw from the documents with respect to her eyesight.

Q.   Now there is something else that seems to bother me about your report.  You talk about her failing, her diminished capacity.

A.   Right.

Q.   Do you have any medical record that says Ethlyn Hall suffered from a diminished capacity?

A.   No.  I looked at --

Q.   Listen, I just want you to answer my question.

A.   I'm sorry.  My apologies.

Q.   Did you review any medical record that said that Ethlyn Hall had diminished capacity?

A.   No.

Q.   You did, however, review the Florida court decision, am I correct?

A.   Yes.

Q.   And the Florida court decision stated that she did not have diminished capacity, correct?

A.   It said she was mentally competent.

Q.   Reading from your report it says:

          The fact that the probate court in
          Florida ultimately found that Ethlyn
          Hall did not have diminished capacity
          does not forgive a breach of fiduciary
          duty.

     So you did note that the court in Florida found that Ethlyn Hall did not have diminished capacity, isn't

that correct?

A.   That's correct.

Q.   You stated earlier there is a difference between -- and you can correct me if I'm wrong -- there is a difference between a breach of a fiduciary duty in whether or not a claim or the elements are made out in court.  Do you remember saying something to that effect?

A.   Well, what I said is that as an attorney --

Q.   Oh, I'm sorry, I misquoted.  I meant the breach of an ethical standard in whether or not there is a claim that can be proven and a judgment rendered in court.

A.   I was drawing a distinction between the breach of an ethical duty and the cause of the action.

Q.   Could you please explain that?

A.    They are not the same.

Q.   Explain that?

A.   Well, if I'm asked to opine on whether or not when Attorney Hall entered into the second, I'll just call it the second lease, the 75-year lease, whether he violated Rule 128.  That does not necessarily -- so let's say that he had an ethical violation, that does not necessarily mean that there is a conversion.  It's got to be specific to a cause of action with respect to the failure of his conduct.

Q.   In other words --

A.   From an ethical standpoint.

Q.    From an ethical standpoint.  You're saying that the fact that there is an ethical problem that you see, the elements -- for instance, we said that -- for instance, for negligence you've got to have duty, proximate cause, damages, all of that.  And you said that because there is no damages, you couldn't get a judgment in the case even though you would still find --

A.    Correct.  I want to be real careful about that. I said I see some potential damages.  What I was saying assuming there is no damages, there could be no judgment. There could be a claim.

In other words, you were asking me about a claim. And I said, well, it could be a claim made but there wouldn't be a judgement if there wasn't any damages.

Q.    That same thing applies to all claims, whether it's negligence, conversion, legal malpractice, any of that there has to be damages, correct, in order for you to get a judgment?

A.    Well, in order to have capacity to sue, the plaintiff has to show that they were damaged or they don't have a standing.

Q.    Okay, capacity to sue I guess I'm not understanding what you mean.

A.    In other words, we see this all the time what the government did where somebody brings a claim and says that

the government did something wrong.  But if that person wasn't personally damaged by it, they don't have a standing to sue.  They don't have a capacity to sue.

Q.   So what you're saying is there may be a violation but did they actually suffer?  They may not have suffered from it you're saying from a standing point of view.

A.   You understand, Attorney King, I was not asked to say whether there were bona fide causes of action.  I was asked to opine a minimal standard of ethical behavior by the attorney.

Q.   So your opinion should not be interpreted that you are saying that there is negligence, for example, or that there is -- let me finish; or that there is a conversion in the tort sense; or that there is a viable claim for an equitable lien?  You're not saying any of that?

A.   That's judge stuff.  That's a judge's instruction for the jury.  That's what you guys advocate.  I was asked to comment on whether this conduct violated ethical duty.

Q.   And that's as far as your opinion goes, am I correct?

A.   That's all I'm supposed to be able to talk about.

Q.   And like we said earlier, your opinions are based upon the facts that were presented to you by the attorney for the plaintiff and those were recited in the beginning of your report, am I correct?

A.   That's correct.

Q.   And it's also based upon the assumptions that you make in terms of the proof that can be made at trial, am I correct?

A.   Yes.

Q.   And would you agree with me if the facts and the assumptions are other than what the attorney has told you, then your opinions may not be correct?

A.   I'd say it a little bit differently.  My opinions could be affected by information that I will have.  One of the reasons why I used the word "presumption" in the report, based on what has been supplied to me, I am presuming that to be true.

Q.   I may be to the end.

Oh, let's put up a copy of the opinion of the Third Circuit.  Let's make that Exhibit 8.

(Off the record)

(Back on the record)

MR. KING:              Okay, here's what we're going to do.  I don't really need to ask you those questions.  She's having a hard time with it.

Andy, your witness.

MR. SIMPSON:              I have no questions.

(DEPONENT FURTHER SAITH NOT.)

---

TRANSCRIPT BY PORTER'S COURT REPORTING, INC. (340) 775-2428

TERRITORY OF THE VIRGIN ISLANDS          )
                                         )    ss.
DIVISION OF ST. THOMAS AND ST. JOHN      )


                I, VERDELL PORTER, a Notary Public within and
for the Territory of the Virgin Islands do hereby certify:

                That prior to being examined, the witness was
sworn by me to testify the truth, the whole truth and
nothing but the truth;

                That said deposition was taken down by me in
shorthand at the time and place herein stated and was
thereafter reduced to typewriting by me or under my
supervision.

                I further certify that I am not of counsel or
attorney for either of the parties hereto, or in any way
interested in the events of this cause, and I am not related
to either of the parties thereto.

                WITNESS my hand and seal this _____ day of
June, 2026.




                                    _____
                                          NOTARY PUBLIC